## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TERRY D. McINTYRE,

                    Petitioner,

            v.                      CASE NO.  08-3089-SAC

DAVID McKUNE,
et al.,

                    Respondents.

### MEMORANDUM AND ORDER

This petition for writ of habeas corpus, 28 U.S.C. § 2254, was filed by a state prisoner. Petitioner seeks to challenge his convictions in December 2000 in the District Court of Douglas County, Lawrence, Kansas.

### I.  BACKGROUND FACTS AND PROCEDURAL HISTORY

On July 2, 1999, "the Payless Shoe Store in Lawrence, Kansas, was robbed at closing time by an armed black man," who also raped and sodomized one of the two store clerks. McIntyre v. State, Case No. 02-C-489, (hereinafter 1507Rec) at 399-400 Memorandum Decision, at 2 (May 3, 2005)(hereinafter MemDsn). One clerk dialed 911 upon spotting a man at the back of the store, but hung up when he said he was leaving. A highway patrolman responding to the dispatch on the 911 hang-up arrived to see a man exit the store and drop a cap. A 1998 Honda Accord vehicle was found in the parking lot, unlocked and with the keys in the ignition. A search of this vehicle turned up the wallet and Kansas

ID of Mr. McIntyre and led to his being a suspect.[1]

The rape victim was taken to the hospital that night, where her panties and swabs of her vaginal cavity were preserved in a sealed rape kit. This evidence was eventually transported to the Kansas City Missouri Police Department Crime Lab (KCM Lab) and analyzed to determine the DNA profile of the unknown rapist.

On August 27, 1999, a federal complaint was filed charging McIntyre with the crimes of interference of commerce by threats of violence and brandishing a firearm during and in relation to a crime of violence. See McIntyre v. Smith, 2005 WL 1945043 (D.Kan. Aug. 12, 2005)(citing U.S. v. McIntyre, 99-CR-20069-GTV).[2] A warrant issued out of Douglas County for McIntyre's arrest on state charges arising from this incident. Surveillance on McIntyre's girlfriend, Dana Jones, culminated in his arrest on September 1, 1999. He was apprehended following a high speed chase during which the vehicle he was driving went airborne and landed in a field, and he then jumped out and ran.[3]

On September 30, 1999, a search warrant to collect blood and hair samples from McIntyre was issued by U.S. Magistrate

---

[1]     Other items recovered from the Honda included a May 1999 receipt for work on the vehicle; a letter, telephone bill, and pay stub each with McIntyre's name; and an Airborne Express uniform and hat from McIntyre's place of employment. A document in the glove box showed the Honda was purchased by Cyrus Carter. Its license plate was registered to McIntyre, but was for an Oldsmobile.

[2]     The federal charges were dismissed, without prejudice, by the U.S. Attorney on January 7, 2000.

[3]     Defense counsel argued, apparently without success, to exclude evidence of the attempted flight. He also sought to exclude evidence that McIntyre was a fugitive for 60 days prior to his arrest and have the arrest date redacted from several documents before they were seen by the jury.

Rushfelt upon the affidavit of F.B.I. Special Agent Stephen Smith. The warrant was executed at the Leavenworth CCA Detention Center by Agent Smith and Lawrence Police Detective Zachary Thomas. Samples of blood were extracted from McIntyre by a phlebotomist in the presence of the two law enforcement officers. At trial, Thomas testified that he and Smith took the blood tubes which had stoppers, to the car where they sealed them in a baggie and applied evidence tape. State v. McIntyre, Case No. 99-CR-978 (REC), Trial Transcript (TT) 479. The officers then marked the tape in each other's presence. Thomas took custody of the samples and checked them into the evidence room at the Lawrence Police Department (LPD).

In February 2000, following the withdrawal of two other attorneys, Mr. Rumsey was appointed to represent Mr. McIntyre. Rumsey immediately filed very detailed and substantial requests for discovery regarding the State's DNA evidence, which if believed, strongly supported a guilty verdict. He also obtained indigent funds for the services of an experienced private investigator and a well-known expert on DNA evidence, Dr. Dean Stetler.

On September 21, 2000, Rumsey filed a motion to continue the trial to allow independent DNA testing, which was granted. The independent DNA test results confirmed the State's results, and thus were not presented by defendant at trial. Upon receiving this highly inculpatory information, defense counsel Rumsey consulted ethical rules and the State Disciplinary Administrator and advised Mr. McIntyre personally and by letter dated November 28, 2000, that

3

his representation would henceforth be limited. Specifically, he explained that he could not assist McIntyre in committing what he believed would be "fraud upon the court," that the "decision to testify will be yours and yours alone to make," but "[i]f you do testify, my role is limited to . . . asking you a few background questions" and then "one general question" of "tell us what you believe happened on the 2nd of July, 1999." 1507Rec, Vol. 1, Affidavit, Exhibit F at 56. He further explained, "You will then be on your own in describing the situation to the court and jury." Id. He also wrote: [I]f you testify the way you told me . . , I must, in an ex parte conference . . . inform the Court that you have testified falsely." Id. After receiving this advice, Mr. McIntyre elected not to testify. Id., Vol. III at 405.[4]

At trial, the two victims, TW and CS, testified as to the circumstances of the crimes. The LPD officers that had first arrived at the scene testified as to statements made to them by TW and CS. Officer Harvey, called by the State, testified that rape victim CS had described the perpetrator as a black male wearing a red t-shirt, dark pants and big, dark sunglasses, and that he did not get height and weight information from CS at the store.

---

[4]     The 1507 judge agreed with Rumsey that:

Knowing what he knew at the time of the November 28th letter, defense counsel was precluded from presenting testimony promoting the defense that Mr. McIntyre maintained.

Id. at 405, MemDsn at 7. The judge concluded:

Clearly Mr. McIntyre was not coerced into not testifying. Rather, he was fully informed of the lawyer's limitations in questioning him should he take the stand.
Id.

Detective Burket testified that he interviewed CS that night at the police station and she described the subject as a black male in his 30's between 5'6" and 5'8" tall, wearing a red t-shirt with logo, black nylon pants, and large dark sunglasses, of medium weight with medium length hair and no facial hair.

Officer Mann, called by the defense, testified that he had interviewed the two clerks in the shoe store on July 2, 1999, and that they described the perpetrator as 25 to 35 years of age, 6' tall, 180-200 pounds, short black hair, black jeans, a red t-shirt with white lettering, dark sunglasses, and smelling of alcohol. He had then taken TW to the front of the store while CS remained in the back office with Officer Harvey. Officer Mann transported TW to the station and conducted another interview, at which she repeated her earlier description, adding a light mustache. On cross-examination, Mann testified that TW had said she was guessing as to height and weight, which the defense elicited Mann had not mentioned either that night or at the preliminary hearing.

Physician Hunt testified that he examined CS at the hospital the night of the rape and took swabs and made slides of fluid found in her vaginal vault that appeared to be semen. He also testified about the chain of custody with regard to the evidence and the care taken to prevent contamination. Nurse Feltman testified that she utilized the KBI sexual assault evidence collection kit on that night and described how she had collected all clothing as it was removed from CS, including her underwear and any foreign material, onto a clean white sheet of paper. She then

placed each item together with that paper into separate bags, and put all other items collected into bags,[5] which she sealed and gave to the law enforcement officer. Officer Harvey testified that he accompanied CS to the hospital, received the items of sealed evidence in the completed rape kit from Nurse Feltman, and took the items directly to the evidence locker at the station. TT at 222. He identified those items at trial. Detective Thomas testified that he transported the rape kit, which he received from the evidence officer at the LPD, to the KCM Lab, along with the sealed samples of McIntyre's blood.[6]

Officer McAtee testified that when he interviewed McIntyre on the day of his arrest, McIntyre stated his height as 5"6" and weight as 157 pounds. McAtee also testified that McIntyre's Kansas ID from November 1997, showed him with a "slight amount of hair," while another exhibited photo showed him bald, and that his driver's license photo issued December 1997, showed him with a little more hair. Leona McIntyre, defendant's wife, testified that

---

[5]     At trial, when Feltman examined the bag with "black panty" written on it she initially testified that since the bra and panty did not have the hospital seal on them she could not tell for sure that they were marked and sealed by her. However, when the State's attorney directed her to Exhibit 2, she identified it as "the bag with the hospital and my seal on it which is the underwear bag that comes in the kit." She further testified that "yes, these are the underwear that she had on at the time and we have her name on there and my signature and tape." TT 280.

[6]     The ball cap and hairs from the cap were transported to the KCM Lab along with the kit. At some point, it was suggested that the kit might have been transported to the KBI. Rumsey argued at the bench that this was a break in the chain of custody, and objected to its admission. The judge ruled that the objection went to the exhibit's weight, and not its admissibility. Thereafter Thomas testified that when he took the sexual assault kit to the KCM Lab, none of the seals were broken (TT 484), and no blue KBI evidence tape was on the evidence. He further testified that the KBI lab was shut down at the time and, after refreshing his memory from his notes, that the sexual assault kit was never taken to the KBI.

her husband has maintained a shaved head since September 1998. Laurie Scott testified that she worked with TW the night of the crimes to develop a computer generated composite, and that TW had described the perpetrator as black, tall, medium build, and with curly dark hair, but said nothing about a mustache. The State elicited that the hair in the composite was the shortest available in the program. The photos, the composite, and the data entered into the program were admitted into evidence.

Ms. Jackson testified that near the time the crimes occurred she was across the highway in her car with her daughter and son leaving the Walmart parking lot, when a black male knocked on the window and offered to pay for a ride without saying where. She refused, and saw him get into another car. Jackson described the man as black, dark, thin, 6'1" tall, and carrying a Walmart-like sack. Her son also testified and described the black male as maybe in his late 30s, not too tall or big, with a little mustache and hair, dressed in a red t-shirt and jeans, and carrying a bluish plastic bag. The daughter testified and described the black male as "real frantic" and wearing a red shirt. The mother testified that she later saw McIntyre's photograph in the newspaper,[7] and she and her children had recognized it as the male that had requested

---

[7] The State sought permission to present evidence of similar robberies in Missouri in which McIntyre was a suspect as relevant to the "main" issue of identity. In the attempts to locate McIntyre, his photograph was placed in the newspaper and he was the subject of a television program. There had been no charges or convictions as to the other crimes. REC Vol. 10, Motion Hearing (June 14, 2000) at 13-14. Defense counsel Rumsey argued against admitting this evidence. The judge ruled that the cases were not sufficiently similar, and thus were inadmissible.

a ride.  She then called the police.  The son testified that he was "positively certain" the photograph in the paper was of the man, and identified McIntyre in the courtroom.  The daughter testified she had been "pretty sure" the man in the newspaper was the "same guy," but did not know if she would recognize him at the time of trial and did not see him in the courtroom.  The mother testified that she did not think she would recognize him at the time of trial.

Mr. Frakes testified that he drew blood from McIntyre around September 30, 1999, and at that time McIntyre had very closely cropped hair, a mustache, a little chin hair, and was fairly short at 5'8" or 5'9".  Detective Thomas testified that when they executed the warrant for blood and hair samples, he was not able to pull hairs from McIntyre's head because his hair was too short.  Thomas also testified that he had picked two very short pieces of hair out of the cap found at the scene, but there were no root tips on this hair to allow DNA testing.[8]

Cyrus Carter was called by the State and testified that he had purchased the 1998 Honda Accord found at the scene for McIntyre, who took possession but did not keep up on payments to Carter.  Then, in April 1999 McIntyre told Carter the vehicle had been stolen, which Carter reported, and the insurance paid off the car.  After searching the abandoned vehicle, Lawrence police

---

[8]     McIntyre claims that Cyrus Carter committed the crimes, saw a patrol car as he exited the shoe store, and lost the ball cap before he ran across the road.  However, no evidence was presented at trial establishing that the cap or the short hairs inside belonged to either Carter or McIntyre.

officers contacted Carter, and he gave a written statement 4 days after the crimes. Carter further testified as follows. The night of the crimes, McIntyre showed up at Carter's residence around 11:30 p.m., and said he had robbed the Payless Store, raped a girl, left the car at the store, and paid a guy $50 to give him a ride to Lenexa. McIntyre asked Carter to report the vehicle stolen, but Carter did not report it as recovered and re-stolen. Carter testified that McIntyre was wearing a red t-shirt with dark baggy athletic-type pants.

Linda Netzel, a forensic scientist and Senior Criminalist with the KCM Lab, testified for the State as an expert in DNA evidence that she had performed hundreds of tests on such evidence. She explained to the jury that DNA results generally fall into one of three categories: (1) an "across the board" match, (2) an across the board exclusion, or (3) inconclusive, which may occur when some results are obtained but not a full profile due to degraded DNA. She also explained that DNA evidence can be contaminated when handled or by other environmental factors, and described what she did to prevent contamination while she worked with the samples. She further testified that analysts at the KCM Lab were subjected to proficiency testing at least twice yearly through an outside agency and none had failed; that the Lab followed the DNA Advisory Board's guidelines as well as the recommendations of the "SWGDAM tech group"; that protocols were followed from the time they received evidence to the time they finished the analysis; that controls were run during the testing and worked appropriately; and

that the KCM Lab documents everything done with a DNA sample.  She also testified that in approximately 30 percent of their cases, the suspect was excluded by the testing.  Netzel testified that she had received a number of items including a rape kit from the LPD on August 5, 1999, and tubes of McIntyre's blood samples taken September 30, 1999, that she had "analyze(d) the case up-front in the trace evidence laboratory identifying body fluids, etcetera," and that she found semen on the vaginal swab of victim CS.  She stated that she had examined and set-up the DNA evidence in this case for testing at the KCM Lab, then handed the samples over to Christine Olsson, a DNA analyst who did the "hands-on DNA work," and that Olsson wrote down "in bench notes" everything she did on a particular sample.  Netzel also explained that:

> [t]he instrument that's used to analyze the DNA is basically set up to work with a laser and the laser helps us locate the DNA and determine the genetic profile and a computer is attached to that instrument and the computer helps us go through the analysis of what that genetic profile is.

TT 618.  Netzel stated that the Lab had analyzed the vaginal swab and blood from victim CS, blood from her boyfriend, and blood from Mr. McIntyre, and that all the data that contributed to the DNA analysis was on the lab's computer.  Netzel had then interpreted the results and prepared the report.  She identified a chart of the genetic profiles of each person tested as reflected in her report.  She further testified as follows.  The DNA profile developed from the unknown semen sample collected from the body cavity of victim CS matched the DNA profile developed from the known blood sample

collected from McIntyre.  The frequency of Mr. McIntyre's DNA profile, his "combination of genetic information," would "not be expected in greater than 1 per 10 quadrillion individuals," or more than the earth's population.  Netzel also collected semen from the victim's panties, which was analyzed; and a report was generated that McIntyre's profile was in the panty stain as well, with the same "profile frequency."  Netzel also testified that sufficient amounts of the DNA samples remained for retesting, which were maintained in the Lab's freezer.

According to petitioner, his principal defenses were that the victims had not accurately identified him visually, that he was not at the scene of the crime, and that Carter was the perpetrator. Defense counsel Rumsey advanced the theories that the victims' descriptions did not fit McIntyre and better fit Carter, and that TW's in-court identification of McIntyre was coached and not credible.  Rumsey cross-examined Carter about statements he had made to the defense investigator, including that Carter had learned the details of the robbery from the police,[9] and had left the state in fear of being charged himself.  Counsel also elicited from Carter his understanding that he could go to jail if he did not testify, that he was 5'11" tall and weighed about 200 pounds, and that police had not taken his blood or hair samples.  Rumsey also argued to the jury that the State's DNA evidence was not reliable.

_____

[9]     As the State pointed out in closing, some details, like the circumstances of the purchase of the 1998 Honda and the ride away from Walmart, were not known to police before they interviewed Carter.

In cross-examining Netzel, he elicited testimony that only fragments of the victim's and McIntyre's entire DNA sequencing were analyzed, and that the population data base was determined from estimates rather than from actually sampling the DNA of numerous other persons. Netzel acknowledged that she could not absolutely say, without testing each of the 10 quadrillion individuals, that no one other than McIntyre would have the same sequence. Rumsey also elicited that the KCM Lab had been and was still unaccredited.

Mr. Cockman, testified that McIntyre had worked for him as a delivery driver at the Airborne Express office in Lenexa near 106th and Lackman Road. He further testified that the log for July 2, 1999, indicated McIntyre's first delivery was at 2:58 p.m., and that his last pick-up at 6:06 p.m. was at a location 8 to 10 minutes from the office. Cockman also testified that McIntyre would have returned to the office and taken 30 to 45 minutes for unloading and processing. In addition, Cockman testified that on July 2, 1999, McIntyre gave him two-weeks notice, but never returned to work. Rumsey pointed out there was no record of how late McIntyre actually remained at the office that day, and elicited that as long as Cockman had known McIntyre, his head had been shaved.

Lenexa Police Officer Hongslo testified as follows. He was dispatched on July 2, 1999, at 9:55 p.m. to the Quik Trip near 95th and Lackman Road to contact McIntyre who had reported a stolen vehicle. McIntyre was wearing a short-sleeved red shirt with print and dark shorts. McIntyre told Hongslo that Cyrus Carter owned the

car, that he had borrowed it from Carter and loaned it to another, unnamed friend who had driven to the mall where the car was stolen.

Private Investigator McPheeter, hired for the defense, testified as follows. On May 15, 2000, he found and questioned Cyrus Carter. Carter told McPheeters that in March 1999, he had purchased the 1998 Honda Accord for McIntyre, and that McIntyre traded in his own car for the Honda and agreed to make payments to Carter. Carter also said that in April, 1999, he asked for the car, but McIntyre said he did not know its whereabouts. Carter thought McIntyre had the car, but "went ahead and reported the car stolen." Carter also told McPheeters that on July 2 at approximately 11:00 p.m., McIntyre and Dana Jones came to his house and asked him to report the car as recovered and re-stolen that night. Carter said McIntyre told him "he was carjacked," and said nothing about the shoe store. McPheeters, having read Carter's police statement, asked if McIntyre had told him about the robbery and how he had known the details in his statement. Carter answered that police officers told him all about the crimes and said he might be charged so, fearing arrest, he used their information in his statement. Carter also told McPheeters that he was taking daily medication that impeded his recall ability, would not be able to testify on McIntyre's behalf, and had notified the Douglas County prosecutor that he would not testify or cooperate.

In closing, the prosecution acknowledged that neither eyewitness gave a complete, accurate description of McIntyre, but argued that whether McIntyre had short hair or a shaved head was

not a significant issue.  The prosecution noted that TW picked another person from the video line-up two months after the crimes, while the composite she helped create the night of the crimes resembled McIntyre.  The prosecution also pointed out that at the preliminary hearing, when the defense had shown TW a photograph of defendant and his wife, TW said she recognized him as the perpetrator and was very certain.  The prosecution argued that it was for the jury to decide whether or not TW identified the right person in court.  They also argued that the strongest evidence against McIntyre was the DNA evidence, and that if the jury believed that the semen on the vaginal swab from CS was the defendant's, it was proof beyond a reasonable doubt of his guilt.  They urged the jury to believe the DNA evidence based upon Netzel's testimony.

Mr. Rumsey argued in closing that DNA evidence generally, in its current state of development, was not accurate enough to meet the standard of proof in a criminal case.  He argued that the State's interpretation was just an estimate based upon statistics that were not mathematically precise, and that the sample was questionable.  He also argued that McIntyre varied from the consistently given description by 4 or 5 inches and 40 pounds.  He emphasized that neither eyewitness had identified the defendant from a line-up, and that TW had only identified him nine months later after his photo had been in the newspaper.  He argued that the two young girls had been manipulated by authority figures like McAtee who had informed TW that the perpetrator had been caught and

was named Terry McIntyre, and the District Attorney who showed the video line-up to TW again after she knew what McIntyre looked like. He suggested that the State had done this "woodshedding" because the DNA evidence "was not an exact match." He noted that Carter had hair and a small mustache, and that the testimony of McIntyre's boss and photos proved that McIntyre was completely bald. He suggested that there were two people with opportunity to commit the crimes, the defendant and Cyrus Carter; and that the eyewitness descriptions fit Carter. He argued that the police had not sufficiently investigated Carter and had not included him in a line-up. He also argued that Carter was not credible because he had committed a prior robbery and had submitted a fraudulent insurance claim. He also went through the time-line created by the evidence, beginning with the 911 hang-up call from the store at 9:03 p.m.; claiming HPO Prideaux observed the robber leaving the shoe store around 9:14 p.m.; noting it took time to find a ride to Kansas City and get through the traffic and intersections, and assuming that McIntyre made the 911 call from the Quik Trip to report his vehicle stolen at around 9:51 p.m.[10]

The prosecution then reminded the jury that evidence came only from witnesses and exhibits and not what counsel stated in closing. They noted that three DNA tests were done and all were the same; and contended that DNA evidence is not new and has been reliably used to free as well as convict defendants. They also

---

[10]    Officer McAtee had testified earlier that it took 31 to 32 minutes to drive from Lawrence to 95th & Lackman Road in Lenexa.

argued that McIntyre had plenty of time to get from the crime scene to Lenexa.

The jury took less than 5 hours to return a verdict of guilty. On January 12, 2001, Mr. McIntyre was sentenced to a controlling term of 645 months in prison. Trial counsel filed a motion for a downward durational departure, which was denied. Rumsey also filed an untimely Motion for New Trial, which was nevertheless considered and denied.

McIntyre directly appealed his convictions to the Kansas Court of Appeals (KCA); and different counsel, Ms. Amber Fox, was appointed to represent him. The only claim Fox raised on appeal was that defendant's "convictions of rape and/or criminal sodomy were multiplicitous with his conviction of aggravated kidnaping." The KCA rejected this claim in its unpublished Memorandum Opinion, finding McIntyre's convictions were in accord with statutory law as amended. Kansas v. McIntyre, App.Case No. 86,715, at *2 (Kan.App. Apr. 26, 2002).

Petitioner also filed a pro se "Supplemental Brief of Appellant . . . pursuant to Supreme Court Rule 6.02," which he prefaced as "made necessary by appointed counsel's failure to properly review record and raise issues germane to his appeal." Therein, he generally asserted that he was denied a fair trial and formulated five issues: (1) erroneous failure to suppress illegally

obtained evidence,[11] (2) perjured testimony admitted through
prosecutorial misconduct,[12] (3) denial of defense expert's request
for hard copies to enable comparison of how the DNA evidence was
tested,[13] (4) break in the chain of custody and contradictory
testimony about DNA evidence,[14] and (5) improper admission of
testimony by Carter that was "obviously perjury."[15] The KCA
described the pro se brief only as "voluminous" and raising
"multiple issues." They stated they had read the brief, compared
it with the record,[16] and "conclude(d) that no point in defendant's

---

[11]     In support of this claim, petitioner argued that the federal search
warrant to collect his blood and hair samples was obtained through the use of
deliberate omissions and falsehoods of material information, and was thus
invalid, so that all evidence obtained with that warrant should have been
suppressed.

[12]     In support, petitioner alleged the prosecutor "coached" victim TW,
who previously had identified another person in a videotaped line-up, by showing
her the video again after she saw McIntyre at the preliminary hearing.

[13]     In support, petitioner claimed he was denied the opportunity to
independently test the State's DNA evidence by their withholding of "the DNA hard
copy disc" of electropherograms and/or peak height analysis. He claimed this
prevented the defense expert from fully reviewing the testing procedures utilized
by Netzel and allowed "a DNA expert's misinterpretation of scientific evidence."

[14]     In support, petitioner claimed that the victim's panties on which his
DNA was found were "tampered with," and pointed to the trial testimony of rape
victim CS that she did not recognize them. However, as noted, Officer Harvey
recognized the clothing taken from CS at the hospital and given to him by Nurse
Feltman with the rape kit. TT 219-221.

[15]     In support, petitioner pointed to inconsistencies in Carter's initial
statement to police that he did not know McIntyre had the Honda, and his trial
testimony "under cross-examination" that he knew McIntyre had the car all along.
He also noted that Carter's testimony differed from that of investigator
McPheeters. He claimed that Carter's testimony was "perjury" and warranted
reversal.

[16]     In his Supplemental Brief to the KCA, McIntyre stated that a copy of
the preliminary hearing transcript was attached, but one was not attached to the
brief provided to this court. There is no indication in the record that the
transcript was otherwise made a part of the state appellate record. The criminal
case files include a motion by McIntyre on March 19, 2002, for expedited
preparation of this transcript and a request that it be included in the record
on appeal to the KCA. A handwritten notation on that motion, apparently by the
court reporter, queried its status. At trial during cross-examination, Mr.
Rumsey referred TW to a copy of this transcript, which he noted was prepared on

17

brief has any merit whatsoever and, as a result, we will not expand this opinion by discussing the issues raised by defendant in his pro se brief." Id. at *4-5. The KCA affirmed petitioner's convictions in April 2002.

Mr. McIntyre appealed to the Kansas Supreme Court, and his appointed counsel again raised only the multiplicity issue. Mr. McIntyre was again allowed to file a pro se Petition for Review. Therein, he formulated two issues: (1) failure to suppress evidence illegally obtained, and (2) denial of request for a hard copy of how the DNA evidence was analyzed. Review was summarily denied by the Kansas Supreme Court in July 2002.

In September 2002, petitioner filed a pro se state post-conviction motion pursuant to K.S.A. § 60-1507. His 1507 motion contained 33 issues asserting ineffective assistance of trial counsel and two issues asserting ineffective assistance of appellate counsel. In February 2003, petitioner added a Fourth Amendment search and seizure claim[17] to his 1507 motion. A four-day evidentiary hearing was conducted by a state district court judge, who noted:

---

June 7, 2000. TT 72. The several Tables of Contents of the Record on Appeal include the transcript order, but the transcript of the preliminary hearing is not listed. However, Volumes 8 and 9 of the Tables are absent, and the criminal case file and index are not in good order. Though the transcript of the preliminary hearing has not been provided, this court has not found that review of this particular transcript was necessary to determine the only claim properly before this court.

[17] This claim mainly challenged the trial judge's jurisdiction to issue a warrant to search McIntyre's residence. McIntyre argued that all the evidence obtained pursuant to Judge Martin's warrant should have been suppressed, and that trial counsel was ineffective for failing to raise this issue. The warrant for McIntyre's arrest is also briefly mentioned, as is that information from a Mr. Settle was used to obtain the federal warrant for blood and hair samples.

> [t]he court has previously appointed three different lawyers to represent Mr. McIntyre, however, because of conflicts or breakdowns in communication between the attorneys and Mr. McIntyre, he has elected to proceed pro se. . . ."

> \* \* \*

> In this case, due to the trial judge's recusal, it is necessary to consider a cold record of the trial and also of the pleadings on appeal. . . . Also, this Court has considered the transcripts of the various hearings on motions filed by trial counsel and the trial transcript.

1507Rec at 399-400.  The judge delineated the main issues raised by petitioner:

> that his trial counsel, Mr. James Rumsey, and his appellate counsel, Ms. Autumn L. Fox, were ineffective in representing him in trial and on appeal . . . .

Id. at 399.  The judge noted that "[m]ost of the 36 issues raised in this proceeding correspond to the issues raised in Mr. McIntyre's pro se appellate brief, which were denied by the Court of Appeals."[18]  Id. at 401.  The judge then specifically stated:

> The issues raised by Mr. McIntyre that have not been previously addressed involve ineffective assistance of counsel and are determined to be as follows:

> 1.  Mr. McIntyre was coerced into not testifying by threats from defense counsel.

> 2.  Defense counsel failed to interview witnesses, cross-exam other witnesses and attack DNA evidence used to identify Mr. McIntyre as the person who committed the offenses charged.

> 3.  Defense counsel failed to object to a search

---

[18]     While petitioner argues that this was not accurate, he ignores the trial judge's implication that he was also referring to alleged trial errors that should have been but were not presented on direct appeal.

warrant issued by the trial judge for a search
outside of Douglas County.

4. Defense counsel failed to timely file a motion
for new trial.

5. That appellate counsel failed to raise issues
on appeal that petitioner requested.

Id. at 402. The 1507 judge made the following findings with

respect to trial counsel:

Mr. McIntyre's trial lawyer filed an exhaustive
number of pretrial motions. Many of the pretrial
motions centered around the admissibility of DNA
evidence and the manner in which the DNA was
tested by the crime lab in Kansas City, Missouri.
Before trial, the defense retained their own DNA
expert and Mr. McIntyre voluntarily submitted a
sample of his DNA for testing. The results of
that test were not offered or admitted at trial,
but the testimony of defense counsel (at the 1507
hearing) and the record reveals that the State's
test results of the DNA samples from Mr. McIntyre
and the victim were a match to the results of the
defendant's voluntary test.

Id. at 400-01. As to appellate counsel, the judge found:

While the appellate counsel raised only the single
issue she felt had merit, the defendant was not
prejudiced because the defendant filed his pro se
brief raising the issues that he felt should be
raised and the Court of Appeals reviewed those
issues. As noted above, the Court of Appeals
found the issues raised by Mr. McIntyre to be
without any merit whatsoever.

Id. at 408. The 1507 judge concluded that petitioner's claims

regarding ineffective assistance of trial and appellate counsel

were without merit and McIntyre was entitled to no relief." Id.

Mr. McIntyre filed a Motion to Amend Memorandum Decision.

Id. at 422. The judge again found that "the majority of the issues

involved alleged trial errors to be considered on appeal, and in

fact, were considered" by the KCA and denied. The judge then limited his discussion to those issues "properly raised" and argued by McIntyre at the 1507 hearing. The judge found:

> Many of the issues raised . . . dealt with identification which were rendered moot after the second DNA test confirmed the plaintiff's (sic) identity as the person who committed the crimes. It was not ineffective assistance of counsel that precluded addressing many of the issues . . . but the results of the DNA tests. As pointed out in the Memorandum Decision, many of these issues became moot because counsel was restricted by the code of professional conduct as to what he could present in defense of the plaintiff after he knew the results of the second DNA test.

Id. at 422-23, Order Denying Motion to Amend MemDsn (June 13, 2005).

Mr. McIntyre appealed the denial of his 60-1507 motion to the KCA. See McIntyre v. State, 157 P.3d 6, 2007 WL 1309576 (Kan.App. 2007). He retained Mr. John Fay to represent him on this collateral appeal. In the brief to the KCA, Fay set forth three issues: (I) ineffective assistance of counsel, (II) cumulative errors amounting to a denial of fair trial, and (III) constitutional violation of privilege against self-incrimination.[19]

---

[19] The "Statement of Facts" in this brief included the following. McIntyre had in his pro se 1507 motion raised issues of ineffective assistance of trial and appellate counsel; "essentially" alleged "mistaken identity" but "was prevented from proving his innocence" by Rumsey forcing him NOT to testify;" and alleged "36 other errors amounting to inadequate representation by Rumsey." Id. at 6. McIntyre had called attorneys Rumsey and Fox to testify, and in questioning both had "waived the attorney/client privilege" without prior advice of counsel. By waiving this privilege, he placed "before the post conviction court evidence of proof of Defendant's guilt that had not been admitted at trial." Id. at 7. Counsel argued that it was improper for Rumsey to testify about the DNA retest, despite McIntyre's waiver, because "it had the effect of negating the privilege against incrimination invoked in the jury trial" and prevented the 1507 court from looking at the 35 instances of ineffective assistance." Fay noted that Mr. McIntyre "did not comprehend basic principles of law" in representing himself at this hearing.

<u>McIntyre v. State</u>, D.Ct. No. 02 C 489, App. No. 94786, Brief of

Appellant at 3.  The allegations made in support of each of these

claims are barely distinguishable.[20]  The KCA affirmed on May 4,

2007, without delineating or separately discussing the issues

presented.  They simply stated:

> We have thoroughly reviewed the record and the
> comprehensive memorandum decision of the district
> court and conclude that the district court should
> be affirmed . . . .

<u>McIntyre</u>, 157 P.3d at *1.

Mr. McIntyre appealed to the Kansas Supreme Court with Mr.

Fay as his attorney.  The Petition for Review filed on June 1,

2007, set forth the following "Statement of Issues:"

> I.  Must a <u>Strickland v. Washington</u> challenger
> completely lose the attorney-client privilege's
> mantle to challenge counsel's effectiveness at
> trial?
>
> II.  May the K.S.A. 60-1507 court consider
> evidence shielded in suppression by the original
> trial court to redetermine defendant's guilt
> instead of evaluating the effectiveness of trial
> counsel?

<u>McIntyre</u>, D.Ct. No. 02 C 489, App. No. 05-94786, "Appellant's

Petition for Supreme Court Review" at (i), 2.  In Ground I, Fay

---

[20]     In support of the first ground, counsel argued that the 1507 court
abused its discretion by "ignoring serious and numerous ineffective assistance
of counsel issues," which it held were moot based upon the independent DNA test
results revealed at the 1507 proceeding.  Counsel asserted that the judge's
reliance upon the independent test results violated "defendant's privilege
against self-incrimination."  In support of the second ground, counsel argued
that McIntyre was denied a fair 1507 hearing and that the judge erred by ignoring
numerous cumulative errors in petitioner's "trial and representation" and relying
"on constitutionally prohibited extraneous independent DNA evidence never
introduced at trial."  In support of the last ground, counsel argued that
McIntyre was denied a fair trial and that the court erred by relying on
"constitutionally prohibited evidence in violation of the privilege against self
incrimination."

argued that in order for McIntyre to make his "Strickland challenge" in the 1507 proceedings, he had improperly been required to waive his attorney-client privilege[21] and to forfeit his right against self-incrimination. In Ground II, Fay asserted that the 1507 judge "erred by not considering the multiple errors of trial counsel," and focusing instead upon DNA test results that were not evidence at trial. Counsel argued that the independent test results were "suppressed at the original trial," and the 1507 judge "should have known" evidence suppressed at trial "was res judicata" at the 1507 proceedings. He further argued that the independent test results were constitutionally inadmissible and it was unconstitutional for trial counsel to refer to them in open court.[22] The Petition for Review was denied on October 1, 2007.

In November 2007, Mr. McIntyre filed a pro se petition for writ of habeas corpus directly in the Kansas Supreme Court claiming ineffective assistance of his counsel on post-conviction appeal, which was denied. See Traverse (Doc. 13) at 12.

---

[21] Counsel acknowledged Martinez v. State, 119 P.3d 704 (Kan.App. 2005) and K.S.A. § 60-426(b)(3) as providing that the attorney-client privilege shall not extend "to communication relevant to an issue of breach of duty by the lawyer."

[22] At the 1507 hearing, McIntyre had clearly elicited his appointed counsels' testimony that independent DNA testing confirmed the State's results. In response to McIntyre's direct examination, trial counsel Rumsey attempted to assert the attorney-client privilege, but McIntyre expressly waived it. (1507Rec, Vol. IV, 187-88). McIntyre questioned Rumsey in connection with his claims that Rumsey had prevented him from testifying at trial and had failed to adequately attack the State's DNA evidence. Rumsey was thus required to explain how, in his professional judgment, his knowledge of the independent results had limited the strategies and defenses available. Similarly, appellate counsel Fox was required upon direct examination by McIntyre to explain her judgment that many of the claims McIntyre wished to assert on appeal had no merit. She recalled the independent test results when McIntyre referred to a letter she had written advising him that for purposes of appeal any challenge to the DNA evidence was moot.

## II. **CLAIMS IN THIS FEDERAL PETITION**

In setting forth his claims before this court, petitioner wrote upon the court-approved forms "See Attached Grounds for Relief," and then attached, among other things, a "Summary of Issues" listing 13 claims. As Issue (1), petitioner claims failure to suppress evidence that was illegally obtained. In support, he alleges that FBI agent Smith "made recklessly false statements and intentionally withheld information in search warrant affidavit to mislead the Magistrate Judge to issue a search warrant."

In all the remaining issues, petitioner claims that trial counsel was ineffective, and each separate issue is simply another ground upon which that claim is based. Those issues or grounds are: (2) counsel failed to move to suppress the affidavit of Lawrence Police Sgt. Mack Pryor, who "used false and deliberately omitted material information in the affidavit;" (3) "counsel failed to move to suppress evidence seized illegally from petitioner's home;" (4) counsel failed to object to and move to suppress an impermissibly suggestive "in-court pre-trial" identification;[23] (5)

---

[23]     Here, petitioner again alleges that TW's identifications of him at the preliminary hearing and trial were tainted. TW testified at trial as follows. She saw the perpetrator during the crimes 5 or 6 times, for "several seconds each time." TT 51. She moved to Oklahoma after the crimes, and detectives subsequently took a videotaped lineup to her for viewing. Mr. McIntyre was in the lineup, but she picked someone else with a rough, low voice. At the preliminary hearing in May 2000, she identified McIntyre as the perpetrator from a photograph. Id. at 54-55, 72. During a recess at the preliminary hearing she and the prosecutor briefly discussed the videotaped lineup. A few months after the preliminary hearing, in September or October 1999 she viewed the videotape for a second time in the prosecutor's office, and at that time picked McIntyre. Id. at 56-57, 108. At trial, TW identified McIntyre from the same photograph as at the preliminary hearing and testified that she had seen no photograph of McIntyre until the preliminary hearing. Id. at 55, 62, 64.

counsel failed to "move to retract NCIC document that disclosed" petitioner's past arrest and aliases; (6) counsel failed "to object to the States false claims that Linda Netzel of the Kansas City Missouri Crime Lab came up with the DNA results;" (7) counsel failed to investigate and interview, or subpoena Christine Olsson to testify about how she came up with the results of her analysis of the DNA evidence; (8) counsel failed to interview FBI Agent Smith; (9) counsel failed to move for a mistrial and failed to object to improper prejudicial comments by the State about Cyrus Carter's perjury testimony;" (10) counsel failed to obtain the security video from the K-Mart near the scene of the crime and of the suspect seen in that store shortly after the crime; (11) counsel failed to call the defense expert to testify that the Lab had "a great deal of trouble coming up with results," would not provide a hard copy, and "could not explain how or who handled the hard samples of DNA during the time period of six months;" (12) counsel failed to obtain the security video footage of petitioner at the Quik Trip at 95th and Lackman Road in Lenexa on July 2, 1999; and (13) counsel accused petitioner of committing fraud upon the court and threatened to abandon him and to inform the court that he "had testified falsely in order to pressure him to relinquish his fundamental right to testify." Thus, in this federal Petition, Mr. McIntyre raises two general claims, the second being ineffective assistance of trial counsel with 12 grounds alleged in support.


## III.   EXHAUSTION AND PROCEDURAL DEFAULT

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state court remedies. 28 U.S.C. § 2254(b)(1); Duncan v. Henry, 513 U.S. 364, 365 (1995)(per curiam)(quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). When a habeas applicant has failed to properly and fully exhaust a claim in the state courts, and state judicial remedies are no longer available to adjudicate that claim at the time the federal habeas application is filed, the applicant meets the technical requirements for exhaustion. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). However, the applicant must then establish that his claim is not barred by the doctrine of procedural default.

Respondents contend in the Answer and Return that all petitioner's claims of ineffective assistance of counsel, which were first raised in his state post-conviction motion, were not presented on collateral appeal to the KCA and the Kansas Supreme Court. They thus contend that petitioner procedurally defaulted these claims in state court; and as a consequence, they are defaulted for purposes of this federal habeas corpus action. They further assert that the only claim petitioner raises which was not procedurally defaulted is his Fourth Amendment claim challenging the trial court's failure to suppress certain evidence, and that this claim is "not cognizable" in federal court.

The court finds at this point that each of petitioner's 13 claims in his federal petition meets the technical requirements for exhaustion. One is exhausted because it was presented to the Kansas Supreme Court on direct appeal. All others are only

"technically exhausted" because they were never presented to the Kansas Supreme Court and they cannot now be presented to that court by way of K.S.A. § 60-1507, which generally prohibits successive state habeas petitions.[24] The court further finds, for reasons that follow, that all petitioner's "technically exhausted" claims that trial counsel was ineffective were procedurally defaulted in state court.

The doctrine of procedural default ensures that a criminal defendant gives the state courts a full and fair opportunity to address the defendant's constitutional claims before resort is had to federal court. Under this doctrine, "[c]laims that are defaulted in state court on adequate and independent state procedural grounds will not be considered by a habeas court, unless the [applicant] can demonstrate cause and prejudice or a fundamental miscarriage of justice." <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1141 (10th Cir. 2009); <u>Coleman</u>, 501 U.S. at 750. In some instances, a federal court has before it a written opinion which clearly provides that a state court's decision to deny relief was based on an adequate and independent state procedural rule. However, procedural default may also be found where, as here, the

---

[24] Petitioner has no real prospect of now obtaining relief in the Kansas courts based on issues he failed to present to the Kansas Supreme Court. <u>See e.g.</u>, <u>State v. Foulk</u>, 195 Kan. 349, 351, 404 P.2d 961, 963 (1965)("[A]ny further attempt to seek the same relief would be a second or successive attempt which is forbidden by 60-1507(c)."); <u>see also</u> <u>Amos v. Roberts</u>, 189 Fed.Appx. 830, 834 (10th Cir. 2006)("Any motion for postconviction relief is now time-barred in state court," under K.S.A. § 60-1507(f)(1) that imposes a one-year limitation period, and a state post-conviction motion may not be used as a substitute for a second or subsequent appeal.); <u>see</u> Kansas Supreme Court Rule 183(c)(3); <u>Brown v. State</u>, 198 Kan. 527, 528, 426 P.2d 49 (1967)(A "proceeding under . . . K.S.A. 60-1507 is not to be used as a substitute for a second appeal.").

petitioner has failed to exhaust state court remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. at 735, n.1; Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007)(Unexhausted claims are subject to "an anticipatory procedural bar," where it is beyond dispute that they would be deemed procedurally barred by a Kansas state court were (petitioner) to attempt to present them in a second application for post-conviction relief).

In the instant case, as noted, petitioner filed a pro se Petition for Review on direct appeal to the Kansas Supreme Court setting forth two issues: (1) failure to suppress evidence, and (2) denial of request for a hard copy of the DNA analysis. The Kansas Supreme Court allowed Mr. McIntyre to file this pro se Petition, and thus the record establishes that these two issues were presented to and considered by the Kansas Supreme Court in denying review. See Harrington v. Richter, ___U.S.___, 131 S.Ct. 770, 783-84 (January 19, 2011)("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits."). Only the first of the two issues that were exhausted on direct criminal appeal is the same as an issue presented by Mr. McIntyre in his federal Petition.[25]

_____

[25] Petitioner claims in his federal petition that trial counsel was ineffective for failing to (6) object to the State's false claim that Netzel "came up with" the DNA test results, (7) investigate or subpoena Olsson concerning how she came up with the DNA results, and (11) call their defense expert to testify that the Lab had troubles, refused to turn over hard copies,

The court next considers what, if any, additional issues were exhausted in petitioner's state post-conviction proceedings. As noted, in his 1507 petition Mr. McIntyre presented 36 issues, 35 of which claimed ineffective assistance of appointed trial or appellate counsel, and an evidentiary hearing was held with petitioner representing himself. Even if Mr. McIntyre presented evidence on all 36 issues at the 1507 hearing, he clearly did not raise all these issues on collateral appeal to the KCA or the Kansas Supreme Court. "A claim has been exhausted when it has been 'fairly presented' to the state court." Bland v. Sirmons, 459 F.3d 999, 1011 (10th Cir. 2006)(quoting Picard, 404 U.S. 270, 275). "Fair presentation means that the petitioner has raised the substance of the federal claim in state court." Id.; see also Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998)("[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court."). The court has already quoted from "Appellant's Petition for Supreme Court Review" on collateral appeal filed by retained counsel Fay, and its "Statement of Issues." None of the three claims delineated therein is the same as any of the 36 issues raised by Mr. McIntyre in his 1507 petition or the 13 listed in his federal petition.[26] The court therefore finds that Mr. McIntyre did

_____

and was unable to explain the handling of the DNA for a six-month period. Even liberally construed, these claims are not the same, and were not fairly exhausted by petitioner's second claim to the Kansas Supreme Court.

[26]     As respondents reason, on collateral appeal "petitioner abandoned his individual claims of ineffective assistance of counsel and instead sought to challenge _only_ the process by which those claims were considered." Petitioner

not present any of the claims raised in his federal petition, other than the one already exhausted on direct appeal, to the Kansas Supreme Court by way of his state collateral appeal. The court concludes that only one of the thirteen claims presented in Mr. McIntyre's federal petition, failure to suppress illegally obtained evidence, was actually exhausted in state court.

As noted, in order to overcome procedural default, a federal habeas petitioner must demonstrate either (1) cause for and prejudice from the default, or (2) that not reaching his claims would result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50. The cause standard requires a showing "that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986). Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials. Id.

Mr. McIntyre states in his Traverse that Mr. Fay prepared his appellate brief and omitted "all of the issues that had been raised in the district court." He alleges that he repeatedly asked Fay to file a supplemental brief raising issues he requested, but Fay thought the additional issues would detract from his arguments. He also alleges that Fay eventually moved for permission to file a supplement, which the KCA granted, but then did not file a

---

"never mentioned nor discussed any specific allegation of trial counsel's ineffectiveness." Thus, "not one actual claim of ineffectiveness was fully and adequately presented to the Kansas Supreme Court for Review." A & R at 13-14.

supplemental brief and refused to communicate with McIntyre until the KCA issued its opinion. Based upon these allegations, he claims in his Traverse that he received ineffective assistance of counsel during his state post-conviction appeals, and that this establishes "cause" for his failure to present his 1507 issues to the Kansas Supreme Court.[27]

Petitioner's allegations that retained collateral appeal counsel failed to present all claims and ignored his requests to present certain claims are not sufficient to show cause for his procedural default.[28] See Parkhurst v. Shillinger, 128 F.3d 1366, 1371 (10th Cir. 1997)(citing Pennsylvania v. Finley, 481 U.S. 551, 555 (1987)). This is because there simply is no constitutional right to an attorney in state collateral or post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. Thomas v. Gibson, 218 F.3d 1213, 1222 (10th Cir. 2000)(quoting Coleman, 501 U.S. at 752, and citing 28 U.S.C. § 2254(i)). Also as a consequence, "ineffective representation in

---

[27] As noted, petitioner also filed an original action in the Kansas Supreme Court claiming ineffective assistance of post-conviction appellate counsel, which was denied. He argues that this constituted exhaustion. However, proper exhaustion includes initial presentation of the same claim at the state district court level, then to the KCA, and finally to the Kansas Supreme Court. In any event, petitioner has not shown that he fully and properly exhausted state court remedies on any of the 35 or 36 claims in his 1507 motion regarding trial and direct appeal counsel by filing a habeas corpus action directly in the Kansas Supreme Court that claimed ineffective assistance of retained post-conviction counsel.

[28] Furthermore, when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." See Faretta v. California, 422 U.S. 806, 820 (1975).

state post-conviction proceedings is inadequate to excuse a procedural default." See Spears v. Mullin, 343 F.3d 1215, 1255 (10th Cir. 2003); Coleman, 501 U.S. at 757 (A failure of post-conviction counsel resulting in procedural default "cannot constitute cause to excuse default in federal habeas."); Parkhurst, 128 F.3d at 1371; see Kasper v. Estep, 2007 WL 1834174, *9 (D. Colo. June 25, 2007)[29](There is no constitutional right to counsel in collateral proceedings, therefore, a failure of post-conviction counsel resulting in procedural default cannot constitute cause to excuse default in federal habeas.), appeal dismissed, 256 Fed.Appx. 202 (10th Cir. Nov. 27, 2007), cert. denied, 552 U.S. 1302 (2008).

Petitioner's contention that ineffective assistance of trial and appellate counsel establishes "cause" for his failure to present his defaulted claims on direct appeal also fails, but for a different reason. While attorney error amounting to constitutionally ineffective assistance of counsel at trial can constitute "cause" for a prisoner's procedural default, see Coleman, 501 U.S. at 754, the ineffective trial counsel claim must be fully and properly exhausted in the state courts as an independent claim before it may be used to establish cause. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000); Hawkins v. Mullin, 291 F.3d 658, 670 (10th Cir. 2002), cert. denied, 537 U.S. 1173 (2003). The same is true of an ineffective assistance of appellate counsel claim. See Murray, 477 U.S. at 489; see also

---

[29] This unpublished opinion is cited for its reasoning, and not as precedent.

Edwards, 529 U.S. at 451; Fleeks v. Poppell, 97 Fed.Appx. 251, 260-61 (10th Cir.), cert. denied, 543 U.S. 933 (2004). Petitioner has not exhausted either of these Sixth Amendment claims. The court concludes that Mr. McIntyre has not demonstrated cause for the default of his unexhausted claims.

Petitioner's only other means of gaining federal habeas review of his defaulted issues is under the fundamental miscarriage of justice exception. Herrera v. Collins, 506 U.S. 390, 403-404 (1993); Sawyer v. Whitley, 505 U.S. 333, 339-341 (1992). This exception applies to a "narrow class of cases" in which a petitioner has the burden of demonstrating that a "constitutional violation has resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995); see Bousley v. U.S., 523 U.S. 614, 623 (1998). The petitioner must make a colorable showing of factual, not just legal, innocence. Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000)(citing Herrera, 506 U.S. at 404); see Bousley, 523 U.S. at 623. Furthermore, the petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup, 513 U.S. at 324, 327-29 (Petitioner must prove with new reliable evidence that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."); see also, House v. Bell, 547 U.S. 518, 537-38 (2006)(A fundamental miscarriage of justice contention necessarily involves evidence

that the trial jury did not have before it.). Neither petitioner's conclusory assertions of a miscarriage of justice nor this court's review of his filings and the record suggests that there is any new reliable evidence of Mr. McIntyre's factual innocence. The court concludes that petitioner has not shown that a miscarriage of justice will result if his defaulted claims are not heard.

In sum, the court finds that petitioner's claims numbered (2) through (13) were not fully and properly presented to the Kansas Supreme Court on either direct or collateral appeal. The court further finds that these claims are procedurally defaulted, and federal habeas corpus review is barred as a result. The court proceeds to consider petitioner's one exhausted claim on the merits.

## IV. GENERAL HABEAS CORPUS STANDARDS OF REVIEW

The Tenth Circuit recently reiterated the standards of review under § 2254:

> If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010), cert. denied, 131 S.Ct. 512 (Nov. 1, 2010).

## V. EVIDENTIARY HEARING

Pursuant to Rule 8 of the rules governing section 2254 proceedings, the court determines that an evidentiary hearing is not required in this case. "[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record." Anderson v. Attorney Gen. of Kansas, 425 F.3d 853, 859 (10th Cir. 2005); see Schriro v. Landrigan, 550 U.S. 465, 474 (2007)("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). The court finds that the record in this case refutes petitioner's allegations and otherwise precludes habeas relief.

## VI. FOURTH AMENDMENT/FAILURE TO SUPPRESS CLAIM

Petitioner claims in his federal petition that FBI Agent Steve Smith made "false statements and intentionally withheld information from the search warrant affidavit for blood evidence, and misled the Magistrate Judge to issue the warrant." He also claims that he "presented evidence" to the trial court that Smith's affidavit contained deliberate misstatements and omissions of material information. He asserts that the standard set forth in Franks v. Delaware, 438 U.S. 154 (1978), applied to determine whether or not probable cause existed for issuance of the federal warrant. He complains that the KCA failed to "thoughtfully consider the facts underlying" this claim and denied it "based on

a very unreasonable determination of the facts in light of the evidence presented." He additionally claims that the state courts did not provide a full and fair hearing, and rejected his claim without reviewing or discussing the merits. He asserts violation of Fourth Amendment rights guaranteed to him through the Fourteenth Amendment.

Initially, the court must determine what legal and factual grounds for this claim were actually presented to the state courts.[30] A habeas petitioner may not present different grounds to support his constitutional claim in federal court than those fully exhausted in state court.[31] The Kansas Supreme Court's summary decision on direct appeal provides no insight into either the grounds alleged in support of this claim or the reasons for the state court's denial.[32] Mr. McIntyre's pro se Petition for Review reveals that he presented this issue to the highest state court as: "Was the failure to suppress evidence illegally obtained reversible error?" In support, he alleged that he requested a hearing pursuant to <u>Franks</u>, in order to suppress the blood and other

---

[30]    This case has been difficult due to petitioner's at times, less than straightforward presentation of the record, his mutating claims, his counsels' different claims, the voluminous record and its disarray, and the state appellate courts' summary dismissals.

[31]    Petitioner alleges that he has raised "three different Fourth Amendment violations:" (1) that the trial court failed to suppress illegally obtained evidence and denied a <u>Franks</u> hearing, (2) that trial counsel failed to suppress evidence illegally obtained during a search of his home, and (3) that trial counsel failed to move to suppress the false affidavit submitted by LPD Officer Mack Pryor. Only the first of these three was fully exhausted. Consequently, it is the only ground considered by this court.

[32]    The denial of this Petition by the Kansas Supreme Court appears to have been by handwritten notation on the front of the Petition with the initials of the Justice(s) that considered the pleading.

samples taken from him for DNA analysis. He claimed that he "documented his motion to suppress enough to require the trial court to hold an evidentiary hearing." He alleged that he provided a written motion distinctly stating "with contrary police reports what was omitted from the Affidavit." He contested the trial court's ruling that even if the omissions and misstatements were true, there were sufficient facts linking him to the crimes to establish probable cause for issuance of the warrant.

The record shows that defense counsel filed a pre-trial "Motion to Suppress the Saliva, Blood and Hair Samples Taken from the Defendant." REC (File 3) at 238 (June 26, 2000). In this motion, defense counsel claimed that the DNA samples taken from McIntyre were "the product of an illegal search and seizure" under the Fourth Amendment. He argued that the facts alleged in the motion showed defendant was entitled to a <u>Franks</u> hearing regarding the validity of the search warrant and a determination as to whether or not the samples should be suppressed. The affidavit sought DNA samples from McIntyre in order to determine if his DNA matched the unknown DNA found in semen samples recovered from the rape victim. The DNA samples were those obtained at the CCA on September 30, 1999, pursuant to the federal warrant issued by U.S. Magistrate Rushfelt. Defendant claimed that FBI Agent Smith "engaged in deliberate omissions of material fact, which if included would not have provided probable cause to seize those samples from the Defendant." <u>Id.</u>, Motion at 1.

The motion contained a list of 11 "facts," which defendant

alleged "the Government" knew but omitted from the affidavit,[33] and three "misstatements of material fact," which he alleged were made by Agent Smith in the affidavit.[34]

Defense counsel argued that the omissions were selective, and that a hearing was needed to obtain the testimony of the officers to determine if the omissions and false statements were deliberate. The State countered that the reports were 4 to 6 inches thick so some information had to be omitted. The trial court ruled as follows:

> Until the Franks decision (defendants) were not allowed to question the veracity of the underlying affidavit. There's still a presumption that the affidavit in support of a search warrant is . . . truthful, but as counsel have both noted the Franks vs. Delaware case has carved an exception to that. The exception in Franks vs. Delaware is

---

[33] The alleged omissions were that HPO Prideaux had observed a black male exit the shoe store wearing a cap, which he later found near the store and identified; (2)(4) that the first description of the perpetrator given by the victims at the scene and repeated by TW in her interview at the station included short black hair, 6' tall, 180-200 pounds, and that the perpetrator was always described as having hair, (3) that McIntyre is 5'6" tall, of medium build, and bald; (5) that the Honda found at the scene was titled to Cyrus Carter; (6) that Carter was a black male, 5'9" tall, 220 pounds, with hair; (11) that rape victim CS was unable to pick McIntyre out of a live line-up on September 3, 1999; (12) that CS was never shown the composite drawing made by TW; (8) that the neighbor claiming he saw the Honda parked in defendant's driveway at 5:00 p.m. on July 2, 1999, was contradicted by business records showing the times of McIntyre's first and last pick-ups; (9) that on July 2, 1999, McIntyre had reported the 1998 Honda was stolen; (10) that Tyrone Jones, brother of Dana Jones who was dating defendant, testified before a federal grand jury in August 1999 that his sister told him that McIntyre was a suspect in the Lawrence robbery, but the owner of the Honda had taken it from McIntyre, committed the robbery, and left the Honda at the scene. Id. at 239-41, Motion at 2-4. Defendant further alleged that interviews of his neighbors did not include a statement that one saw the Honda parked in McIntyre's driveway at 5:00 p.m.; that defendant in fact went to work that day; and that an employee at a Goodcents store had seen a person running by who might have been the perpetrator and described him as larger in height and weight than defendant and as having hair.

[34] The alleged misstatements were: (1) that Smith claimed the getaway vehicle traveled east when Jackson had said it turned north; (2) that Smith failed to state that CS had intercourse with her boyfriend the morning before the rape; and (3) that Smith failed to state that the only hair samples taken at the hospital were from the victim. Id. at 241-42, Motion at 4-5.

whether there has been an intentional false statement or a reckless disregard for the truth. In Kansas the <u>State v. Jacks</u> decision follows <u>Franks</u>. . . . Mr. Rumsey has correctly stated that the defendant must make a substantial preliminary showing that the affidavit to a search warrant contained a false statement made knowingly and intentionally or facts made with a reckless disregard for the truth in order to be entitled to the hearing. . . .

So the first question is whether Mr. McIntyre is entitled to that hearing. The Court first finds that there has not been a substantial preliminary showing that the facts were deliberately omitted. What substantial preliminary showing means has never exactly been defined but there must be some offer of proof. It doesn't say that the defendant must make a substantial preliminary showing of an omission. The substantial preliminary showing must be of a deliberate omission, of a material omission. Likewise any false statement the substantial preliminary showing is not just that something was false, but that it was an intentional false statement so that substantial preliminary showing goes both to the intentional aspect as well as the false statement aspect. . . . There has been a showing of that statement perhaps is false or that – and definitely that information has been omitted. But there has been no substantial preliminary showing of any intentional or deliberate act. Quite a part (sic) from that, however, the omitted facts this Court finds were not material . . . . So a part (sic) from whether there was any deliberate omission when this Court includes all of the alleged omissions and adds those to the facts that were set forth in the affidavit, this Court still finds that there were sufficient facts linking the defendant to the crime to establish probable cause for the search warrant to issue. This continues to be true even if . . . two misstatements one about Ms. Jackson's statement concerning the direction of travel and the other the neighbor's statement concerning the location of the car at 5 p.m. Even if those are corrected or completely deleted from the affidavit, this Court finds that there would still be probable cause for the search warrant to have issued. Defendant's request for a <u>Franks</u> hearing is denied. There being no evidence that the omissions of fact from the affidavit were

> deliberate or that the omitted facts would have, had they been included, undermined the magistrate's finding of probable cause.

REC Vol. 16, Motion Hearing (August 31, 2000) at 13-15.

In his pro se Petition for Review on direct appeal, McIntyre generally challenged the trial court's denial of a <u>Franks</u> hearing, and asserted that the samples taken for DNA analysis should have been suppressed. He then "briefly describe(d)" the contents of the Motion to Suppress as follows: (1) perpetrator described as 6'0", 180-200 pounds with short black hair; (2) defendant is 5'6", of medium build and has been completely bald since September 1998; (3) rape victim was unable to pick the defendant out of a live lineup; (4) Jackson's statement was that the man approached her car before 9:00 p.m.; (5) the Jacksons did not recognize defendant from a photograph, "but from a picture in the newspaper for Crime Stoppers;" (6) the Jacksons did not say the car they saw was traveling toward Kansas City; (7) Smith omitted that victim CS had intercourse with her boyfriend at 11:00 a.m. the day of the crimes; and (8) the neighbors did not see the Honda at defendant's residence at 5:00 p.m. McIntyre also mentioned that he had reported the car stolen.[35] He added the bald statements that "all allegations contained in the Affidavit concerning (him) were

---

[35] Mr. McIntyre has collectively alleged a large number of omissions and false statements. His list of errors in his statement of facts in his federal petition runs for 7 pages. It differs from the lists in counsel's pretrial motion, in McIntyre's pro se pretrial motion and in his affidavit and pro se memorandum submitted with his 1507 motion. The additional numerous omissions that petitioner alleges were made by Sgt. Pryor in the warrant affidavits for his arrest or for the search of his residence are not considered herein, since as noted, challenges to those warrants were not exhausted.

erroneous," and that the only allegations in the Affidavit not challenged by (him)" were his criminal history and the statement that he asked a friend to report his car stolen.  Since the factual basis for a claim must be exhausted as well as the legal basis, this court need only consider those omissions and false statements that were actually presented to the Kansas Supreme Court.  No other grounds were fully and properly exhausted, and any unexhausted claim is now procedurally defaulted.  As noted, petitioner's pro se Fourth Amendment claim was denied without discussion by the KCA, and the Kansas Supreme Court.

### A. *Stone v. Powell Bar*

Respondents argue that federal habeas corpus review of petitioner's Fourth Amendment claim is barred by <u>Stone v. Powell</u>, 428 U.S. 465 (1976).  In <u>Stone</u>, the Supreme Court held that:

> where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial.

<u>Id</u>. at 482, 494;[36] <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1265 (10th

---

[36]    The court reasoned that "the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant".  <u>Id</u>. at 490.  The court further reasoned that "in the case of a typical Fourth Amendment claim, asserted on collateral attack, a convicted defendant is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration." <u>Id</u>. at 491 n. 31.  The Court then stated:

> We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions.  But the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation

Cir. 1999); Miranda v. Cooper, 967 F.2d 392, 400-01 (10th Cir.),

cert. denied, 506 U.s. 924 (1992); Gamble v. State of Okl., 583

F.2d 1161, 1165 (10th Cir. 1978).  Thus, the threshold question on

this claim is whether or not the State provided Mr. McIntyre with

such an opportunity.  Gamble, 583 F.2d at 1164.  In Gamble, the

Tenth Circuit held that the:

> "opportunity for full and fair consideration"
> includes, but is not limited to, the procedural
> opportunity to raise or otherwise present a Fourth
> Amendment claim.  It also includes the full and
> fair evidentiary hearing contemplated by Townsend
> [v. Sain, 372 U.S. 293 (1963)].

Gamble, 583 F.2d at 1164-65 (footnotes omitted); Sanders v. Oliver,

611 F.2d 804, 808 (10th Cir. 1979), cert. denied, 449 U.S. 827

(1980)("'opportunity' includes procedural opportunity to raise a

claim.").  A federal habeas court is not precluded from considering

Fourth Amendment claims "where the state court willfully refuses to

apply the correct and controlling constitutional standards."

Gamble, 583 F.2d at 1165.

Mr. McIntyre does not argue that the state courts failed or

refused to apply the correct constitutional standard.  Nor does he

allege facts establishing that he was denied all procedural

opportunity to present his Fourth Amendment claims in state court.

He simply assumes that, because he was denied an evidentiary

hearing under Franks and his claims were summarily denied on

appeal, he was not provided a full and fair opportunity to litigate

--------------------

to the costs.

Id. at 493.

his Fourth Amendment claim. However, the fact that his request for a full-blown evidentiary hearing under _Franks_ was denied does not mean the opportunity provided for presentation of his claim was not full and fair. _Miranda_, 967 F.2d at 401; _Sanders_, 611 F.2d at 807-08. Petitioner disregards that he was afforded a hearing by the trial court on his request for a _Franks_ hearing and his motion to suppress. Under _Franks_, the trial court was not required to conduct an additional hearing to receive evidence unless the defendant satisfied "his preliminary burden of showing that (the officer's) allegedly false statements (or omissions) were either deliberate or made with reckless disregard for the truth, and that those false statements (or omissions) were material to the probable-cause determination." See _Balistreri v. Ryan_, 2009 WL 4673931 (D.Ariz. Dec. 3, 2009)(cited for language).

Mr. McIntyre was given the opportunity for his Fourth Amendment claim to be fully briefed and presented to the state trial court, which it was by his appointed counsel in his motion to suppress. The trial court provided the opportunity for litigation at the suppression hearing and made "explicit findings on matters essential to the fourth amendment issue." See, _e.g._, _Cappelli v. Zavaras_, 249 Fed.Appx. 52 (10th Cir. 2007); _Tukes v. Dugger_, 911 F.2d 508, 513-14 (11th Cir. 1990). The court found that while movant had pointed out some omissions and perhaps false statements, he failed to submit any proof of intentional falsity or reckless disregard for the truth on the part of the affiant. Nevertheless, the trial court also expressly examined the alleged omissions and

misstatements, considered the evidence as it related to probable cause, and found that the alleged errors were not material and that there was sufficient evidence to support the issuance of the warrant even if the misstatements were disregarded and the omissions were added.[37]  Petitioner was also given the opportunity for direct appeal with the assistance of new appointed counsel who reviewed his potential claims and the record.  He was then allowed to present his Fourth Amendment claim in his pro se appellate briefs.  Mr. McIntyre has utterly failed to allege facts indicating that these litigation opportunities, that is the pretrial hearing, the findings and ruling of the trial court, and the allowance and consideration of his pro se briefs in the appellate courts, were other than full and fair.  The court concludes that the record establishes that the State provided Mr. McIntyre with full and fair opportunity to litigate his Fourth Amendment claim.  It follows that this court is precluded from considering this claim.  See Alverson v. Sirmons, 2008 WL 5122348 (N.D. Okla. 2008), aff'd 595 F.3d at 1142.

Petitioner disagrees with the trial court's ruling that he did not meet the Franks standard.  It has been held that "[u]nder Stone it is irrelevant whether the trial court was correct in finding that the Franks standard was not met."  See id. (citing Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994), cert.

_____

[37]     The Application and Affidavit for Search Warrant of Agent Smith is attached to the Motion (Exhib. A).  In the affidavit, Smith described circumstances of the rape and robbery that do not differ substantially from the trial testimony.

denied, 513 U.S. 1183 (1995). As the Seventh Circuit succinctly stated, "'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." Cabrera v. Hinsley, 324 F.3d 527, 532 (7th Cir.), cert. denied, 540 U.s. 873 (2003).

Petitioner argues that Stone v. Powell does not bar federal habeas review of a Sixth Amendment claim challenging defense counsel's failure to litigate a Fourth Amendment violation. However, this argument entitles him to no relief because, as previously discussed, McIntyre's Sixth Amendment ineffective assistance of trial counsel claims were not properly exhausted and are procedurally defaulted. In any event, trial counsel obviously did litigate the motion to suppress, and petitioner alleges no facts demonstrating that trial counsel's efforts on this particular matter were constitutionally deficient.

### B. Merits of Claim

Having reviewed the entire record, the court also remarks that, even if this claim were somehow found not to be barred by Stone v. Powell, the state courts reasonably held it has no merit. When clearly established Supreme Court precedent exists, the federal habeas court must consider whether the state court decision was contrary to or involved an unreasonable application of that federal law. House v. Hatch, 527 F.3d 1010, 1018 (10th Cir. 2008), cert. denied, 129 S.Ct. 1345, 173 L.Ed.2d 613 (Feb. 23, 2009). A state court decision is "contrary" to clearly established law "if

the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application" of clearly established law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003)(citing Williams v. Taylor, 529 U.S. 362, 413 (2000)).

As noted, Mr. McIntyre does not argue that the trial court applied a rule different from the controlling Supreme Court precedent. He might be read as arguing that the trial court incorrectly applied the Franks standard to the facts of his case. The court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. See Williams, 529 U.S. at 409-10. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." House, 527 F.3d at 1019 (citing Maynard v. Boone, 468 F.3d 665, 671 (10th Cir. 2006), cert. denied, 549 U.S. 1285 (2007). "[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." Id. Petitioner's claim might also be read as a challenge to the factual findings underlying the trial court's denial of his motion to suppress. Claims of factual error are reviewed pursuant to 28 U.S.C. § 2254(d)(2). See Romano v. Gibson,

278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). That Section allows the federal habeas court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), the state court's factual determinations are presumed to be correct, and petitioner bears the burden of rebutting the presumption by clear and convincing evidence.

Applying these provisions of § 2254 to this case, it is clear that the Kansas trial court's ruling and the appellate court's decisions affirming that ruling were not an objectively unreasonable application of <u>Franks</u>, and were not based upon an unreasonable determination of the facts in light of the evidence presented. In <u>Franks</u>, the Supreme Court held that:

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. . . .

<u>Franks</u>, 438 U.S. at 171-72 (footnote omitted). Petitioner claims he was entitled to an evidentiary hearing and cites the <u>Franks</u> holding that where the defendant makes a substantial preliminary

47

showing that a false statement knowingly or with reckless disregard for the truth was included in the affidavit, and if the allegedly false statement is necessary to finding of probable cause, the Fourth Amendment requires that a hearing be held at defendant's request.  Mr. McIntyre's mere recitation of the _Franks_ standard does not establish his entitlement to relief.  His bald contention that he presented sufficient evidence is soundly refuted by the record.

Mr. McIntyre has indeed alleged in detail an endless and varying stream of facts that he now believes were omitted and erroneous.  However, he has referred to no witness statements, affidavits, or other proof that was presented at the pretrial hearing, which showed that Agent Smith acted either deliberately or recklessly in withholding or including the alleged erroneous information.  As the trial judge plainly pointed out, Mr. McIntyre was required to prove not just that a particular fact was omitted or incorrect, but also that the omission or misstatement was deliberate and material.  Petitioner's allegations of deliberateness throughout have been nothing but conclusory statements and pure speculation.

Furthermore, the trial judge's holding that sufficient content remained to support probable cause, even with the alleged omissions added and misstatements deleted, was not an unreasonable application of the federal rule in _Franks_.  The affidavit clearly remains sufficient even when one sets aside the allegedly false statements that witnesses saw the potential getaway vehicle travel

east from Walmart and that a neighbor observed McIntyre's Honda parked at his residence a few hours prior to the robbery. The facts that CS had unprotected sex with her boyfriend the morning of the crimes and was unable to pick defendant out of a line-up two months after the crimes, if added, do not negate probable cause. Nor would the addition of Ms. Jackson's general statement as to the time of her encounter in the Walmart parking lot have destroyed probable cause. Likewise, had the affidavit included the fact that the photo from which McIntyre was recognized by the Jacksons was that in the newspaper, the affidavit's content still supports probable cause.

McIntyre's multiple allegations that the eyewitness descriptions of the perpetrator did not match his physical characteristics also fail to establish a material omission. Eyewitness accounts regarding the height or weight of a briefly encountered stranger are rarely going to be precisely accurate. The overall descriptions given by the two eyewitnesses in this case did not eliminate McIntyre as a suspect, particularly that of CS who had more opportunity to observe her rapist's physical characteristics. Despite Mr. McIntyre's repeated statements to the contrary, CS described the rapist the night of the crimes as 5'6" to 5'8" and of medium build. TW's description was less accurate, but the perpetrator was wearing large dark glasses and warned the victims not to look at him. In addition, TW was sent to the back of the store and according to her testimony saw him for a total time of several seconds times 5 or 6.

Mr. McIntyre's insistence that he could not have been the perpetrator because he shaves his head and that all descriptions included short hair also fails to establish a material omission. Even if Mr. McIntyre's hairstyle was a shaved head during the relevant time frame, he presented no proof that his head was absolutely clean shaven on July 2, 1999, or that Agent Smith must have known that his head was clean shaven on that date. Obviously, one who shaves and is not naturally bald, at times has short hair or stubble. Witnesses other than the victims testified that they had seen Mr. McIntyre with very short hair rather than a shaved head. Moreover, as the State responded to defendant's motion to suppress, the fact that the perpetrator had short black hair was alleged by the victims, so it was not an omission or misstatement in the affidavit.

The omitted facts that McIntyre had reported the vehicle stolen, when it was after the crimes, and that the vehicle was titled to Carter do not significantly contradict or undermine other significant content in the affidavit. All evidence indicated that McIntyre was the one who took possession of, drove, and maintained the vehicle from the time it was purchased. The affidavit correctly provided that Mr. McIntyre's personal possessions including identification were found inside the vehicle abandoned at the scene, his license plate was on that vehicle, and he was

implicated by a friend in the robbery and rape.[38]  The court finds that the record plainly supports the trial judge's determination of the facts in light of the evidence.

The court concludes that the state courts' reasonably applied <u>Franks</u> in ruling that McIntyre failed to satisfy his burden of making a showing, accompanied by the requisite offer of some proof, that the affiant "knowingly and intentionally, or with reckless disregard for the truth" made either "a false statement which, if omitted from the affidavit would have negated probable cause," or an omission, which, if included in the affidavit, would have negated probable cause.  See <u>U.S. v. Lebowitz</u>, 647 F.Supp.2d 1336 (N.D.Ga. 2009).

Mr. McIntyre has attempted to expand this claim to include allegations that the State's DNA evidence was "tainted" or manufactured.  Throughout his pleadings, and particularly in his Traverse, he has repeatedly referenced a voluntary semen sample. The factual basis for this reference was not evident until the court reviewed the transcript of the 1507 hearing.  At that hearing, while questioning Detective Thomas, Mr. McIntyre stated that when Agent Smith and Thomas came to the CCA on September 30, 1999, to execute the federal warrant for blood and hair samples, he had not wanted to be stuck with a needle and have blood drawn without his attorney present, so he momentarily exited and

---

[38]   There has been no showing that petitioner's numerous other allegations in his federal petition were exhausted in state court.  Most involve insignificant details, speculation, and his self-serving opinions or accounts that do not establish material facts or any deliberate action on the part of affiant Smith.

voluntarily produced and deposited semen into a baggie. He further stated that he returned and threw the baggie to Smith and Thomas, and that Netzel thereafter smeared this "voluntary" semen sample onto the victim's panties. Thomas testified at the 1507 hearing that this had not occurred, would have been against protocol, and that he and Smith did not receive any semen sample from McIntyre that day. Attorney Rumsey also testified that he did find credible, and thus did not pursue, this claim by his client. The court also finds this scenario to be less than credible. In any event, petitioner's claim that the State's DNA evidence was manufactured in this manner was not fully and properly presented to the Kansas Supreme Court and has been procedurally defaulted.

In sum, the court finds that this court's review of petitioner's only claim that was not procedurally defaulted, his Fourth Amendment claim, is barred by <u>Stone v. Powell</u>. The court makes the additional observation that the state courts' decisions on this claim are not shown to have been based upon an unreasonable application of Supreme Court precedent or to have involved an unreasonable determination of the facts. Accordingly, the court concludes that Mr. McIntyre is entitled to no relief under § 2254, and his petition is denied.


## VII.   <u>DEFAULTED CLAIMS ALSO LACK MERIT</u>

The Tenth Circuit has instructed that "[w]hen questions of procedural bar are problematic, and the substantive claims can be disposed of readily, a federal court may exercise its discretion to

bypass the procedural issues and reject a habeas claim on the merits." See Cannon v. Mullin, 383 F.3d 1152, 1159 (10th Cir. 2004), cert. denied, 544 U.S. 928 (2005). The determination that petitioner procedurally defaulted all but one of his claims was difficult, but mainly due to his having varied his legal claims and his underlying factual allegations throughout his direct appeal and collateral proceedings. Thus, the court does not find that a review of the merits of petitioner's defaulted claims is warranted. The court simply makes the observation that even if petitioner's substantial, but by his insistence mostly unguided, efforts were somehow deemed sufficient to satisfy the exhaustion prerequisite or overcome procedural default, none of petitioner's other claims has merit. The court comments upon a few of those claims.

### A. *Denial of Discovery & DNA Claims*

In his pro se Petition for Review on direct appeal, Mr. McIntyre raised only one issue regarding the State's DNA evidence, which he framed as: "[t]he district court abused it's discretion in denying defense experts request for hard copy of how the DNA evidence was analyzed." He asserted the "right to independent testing of the State's critical (DNA) evidence," and cited U.S. v. Nixon, 418 U.S. 683, 711 (1974), as holding that a defendant has a constitutional right to the production of "all relevant and admissible" evidence. He claimed that the district court abused its discretion and violated K.S.A. § 22-3212, which allowed discovery of the data upon which the State expert's opinion was

based, and that his constitutional rights were violated. He argued that the testimony of appointed defense expert Dr. Stetler established that the "hard copy" was necessary to properly evaluate the State expert's DNA testing procedure. Thus, McIntyre's claim that he was denied a hard copy of the underlying data was the only challenge to the State's DNA evidence that he presented to the highest state court, and he presented no such challenge on collateral appeal.

As previously noted, petitioner claims in his federal petition that trial counsel was ineffective, and in 3 of the 12 underlying grounds for this Sixth Amendment claim essentially alleges that counsel failed to adequately challenge the State's DNA evidence. The 3 grounds are that trial counsel failed to object to the State's allegedly false claim that Netzel "came up with the DNA results;" failed to investigate or subpoena KCM Lab technician Olsson to testify about how she came up with the DNA results; and failed to call Dr. Stetler to testify about the Lab's problems, its refusal to provide a hard copy, and its inability to explain "how or who handled" the DNA samples during a six-month period. Mr. McIntyre was previously found herein to have procedurally defaulted his claim that trial counsel was ineffective. The only allegation among the three DNA-related claims in his federal petition that might arguably be considered as having been presented to the Kansas Supreme Court, and thereby exhausted, is that counsel failed to call Dr. Stetler to testify that the Lab refused to provide a hard copy of the DNA analysis. However, this is not literally the same

as alleging that the trial court's discovery ruling denying a hard copy violated petitioner's constitutional rights. If this challenge to the DNA evidence is construed as based upon the trial court's denial of his discovery request for a hard copy, it was exhausted. If it is considered as based upon his trial counsel's failure to present evidence that the Lab refused to provide a hard copy, it is not. In either case, it fails to state a federal constitutional violation.

The record shows that defense counsel Rumsey filed a pre-trial request for extensive discovery regarding the State's DNA evidence. At the conclusion of a hearing on May 4, 2000, the trial judge recounted the history of her discovery rulings:

> The defendant is requesting, and on February 23, 2009, the State had agreed to provide, hard copies of the electropherograms and peak height analysis created in the DNA analysis performed by the State's expert witness. The State has agreed to provide this information on a zip disk, but after consultation with its witness, now argues that it would be unduly burdensome to provide hard copies of that information.
>
> A hearing to settle the discovery order was held on April 11, 2000. The court asked specific questions of counsel, each of whom deferred to his expert, who provided unsworn responses to many of the court's questions. The court requested counsel to provide legal authority, documentation, and/or verification of certain information and took the matter under advisement.
>
> The court has now reviewed the letter from Mr. Little . . . along with the exhibits and case law attached to that letter; the Defendant's Response to Court's Request to Provide Information; the Defendant's Memorandum Regarding Production of the State's Expert's DNA Analysis, Electropherograms and Peak Height Analysis and defendant's exhibits.

The court finds that K.S.A. 22-3212 requires the State to provide "results or reports . . . of scientific tests." The State has done this and has provided additional information that the statute does not require it to produce. The items defendant is seeking do not fall within the definition of "results" or "reports" of scientific tests."

. . . The applicable Federal rule, Rule 16(a)(1)(D) is substantially the same as K.S.A. 22-3212. . .

. . . The only thing that the defendant is seeking that has not been provided is the electropherograms and peak height analysis in hard copy form.

The court finds that the discovery sought is not within the scope of K.S.A. 22-3212 as it is neither the result or report of a scientific test. The court further finds production of the requested discovery would be unduly burdensome. . . . the court has now amended by interlineation the disputed portion of the proposed Order to be consistent with the foregoing decision.

REC at 124-26, Order at 1. The record thus reveals that after multiple proposed orders and negotiations, substantial briefings, and hearings, the trial judge essentially granted all of the defendant's discovery requests except one: it did not require the State to produce a "hard copy print out of the electrophenogram and peak analysis graphs."[39]

---

[39]    In the trial court's "Order Granting Discovery" filed May 8, 2000, the State was ordered to provide defendant's counsel with: descriptions of all scientific devices, machines, and equipment used by the KCM Lab in performing its analysis including the manufacturer, and the model and serial numbers of each; information to download their instruction manuals; and "all results or reports of scientific tests." REC at 127 et seq. The court noted that the "State has agreed to provide a legible hard copy of all bench and field notes created by anyone performing work in the DNA analysis in this case," a "copy of all the data created during the DNA analysis on a Zip Drive," and "shall also provide sufficient blood and semen samples to defendant for independent testing." Id. at 131, Order at 5.

    The court found that the following had already been provided to defense expert Stetler: a complete description of the repairs and maintenance performed

Defense counsel filed a Motion to Reconsider asserting that the failure to provide the "underlying data" upon which the State's expert based her opinion impeded effective cross-examination of the Netzel and violated defendant's Sixth Amendment right to cross-examine.[40]    In support, he argued that it prevented the defense expert from testing whether Netzel properly selected and interpreted the data she chose to review, and from reviewing the data in advance to assist counsel in formulating questions.  At a hearing held on June 14, 2000, Dr. Stetler informed the court that the KU lab to which he had access did not have the software to read

_____

on these devices for the past 5 years; all proficiency testing on laboratory personnel; written laboratory protocol for the KCM Lab; copies of quality control guidelines; and the population data base utilized by the Lab to calculate the genotype frequency in this case.  In addition, Stetler was granted the right to visit the Lab to review originals of all the items described in Defendant's Requests Nos. 1-16.

The court also ruled that even though the State's attorney reported there had been none of the following, if changes occurred before the end of trial copies were to be provided: correspondence or notes of telephone conversations with the manufacturer of the equipment "during the DNA analysis performed in this case;" and notices from the manufacturer to the Lab of defects or recalls in the equipment.  The order also provided that the State's attorney had represented that no photographs were taken or autorads created in the DNA analysis, and that no person other than Linda Netzel and Christine Olsson had participated in the DNA analysis in this case.  In the event that the latter information proved to be inaccurate, the State was to provide detailed information as to that person's education, experience, and relevant court appearances.

[40]    In this "Motion to Reconsider Discovery Order Regarding Defendant's Receiving Underlying Data of State's Expert's DNA Analysis and Supporting Memorandum," Rumsey urged the court to require the State to provide the defense with "a legible hard copy of the electropherograms and peak height analysis tables (EL&PH Tables) generated by the (KCM Lab)." Id. (File 2) at 152. Rumsey argued that this data was within the scope of K.S.A. 22-3212, because it was results created by the DNA analysis.  He summarized the following supporting "facts."  The "samples are analyzed by a computer, and the computer's software program generates data that describes each DNA fragment found in the form of an (EL&PH Table)." Id. at 155.  The Lab used a computer software program that generated 275 electropherograms.  For each electropherogram generated, the program also generated a peak height analysis table.  "The (EL&PH Tables) are the end data results generated by the computer program. Id. at 154.  The State's expert reviewed all 275 EL&PH Tables and "selected 146 of them." Id.  She then wrote a report containing her opinion and conclusions based upon those she selected.  Counsel argued that the State had thus provided only the conclusions of the lab technician.

the zip drive provided by the State, and that the updated software would cost around $15,000. REC (Vol. 10) at 31. Counsel stated that the Board of Indigent Defendant Services had turned down his request for this sum, which the defendant could not personally afford. Dr. Stetler explained that DNA analysis in every case involves three steps: preparing the samples for analysis, performing the analysis, and reviewing the results of the analysis to form an opinion. He testified that he needed to see "a hard copy of the (EL&PH Tables)" because the Lab's report was an analysis summary or conclusion based on the results and data observed by the lab technician, and that alternative or different conclusions can often be drawn from the data. Stetler stated that without the underlying data, he could not possibly make any determination as to whether the lab technician's exclusion of some of the EL&PH Tables was warranted and whether or not her conclusions in her reports were accurate; while with the data he could determine if the scales were manipulated or peaks were omitted from the tables to distort the results. He also stated his opinion that reports indicating there were several "relatively unsuccessful" runs, when only two runs were necessary, meant something "went wrong many times," and "there must have been significant problems." Id. at 47. In addition, Stetler testified that four other labs had provided the EL&PH Tables with their results in other cases, and that printing out this data was not difficult. He noted that in a Wyandotte County case in 1999, the KCM Lab had refused to turn over hard copies and as a consequence

was prohibited by that court from testifying about its conclusion.

Thus, the record shows that defense counsel together with Dr. Stetler fervently argued that the State's DNA evidence could not be adequately reviewed unless they were given access not only to the scientist who had prepared the report, but also to all the underlying data produced from the DNA samples and analyzed at the KCM Lab. Defense counsel submitted numerous exhibits in support of his argument that this data was essential in order for the defense expert to adequately evaluate the reliability of the State's strongest evidence.

The State argued in opposition that it was offering to turn over a zip drive that contained the complete electronic raw data generated by the computer and that the defense had been given "all the graphs, electropherograms, raw data, runs not used etc., in the same format the (KCM Lab) uses during its normal course of business."[41]   Id.   The State also argued that the defense was ignoring that blood and semen samples were available for re-testing, and that "several independent private labs" had the ability to use the zip disk to make all the data available to the

_____

[41]      An affidavit of Linda Netzel is in File 2 at 195, marked as Exhibit I.  Therein, Netzel averred that she had acted as a "Senior Criminalist" with the KCM Lab since February 1993, and that the KCM Lab used the "ABI Prism 310 Genetic Analyzer made by PE Applied Biosystems" in the analysis of DNA evidence.  Id. She averred that it would be unduly burdensome to print every aspect of the data as it was analyzed by Netzel and Olsson.  She averred that the hard data provided by each lab differed, but that none of the labs provided printouts of failed injections, unused data, or all the controls and standards utilized in the analysis.  She stated that the electronic data provided on the zip drive was more extensive than that which could be provided in print outs and that the KCM Lab was providing 100% of the data generated in the case.  She further stated that she had contacted three private labs having the ABI 310 and was told they could use the zip disk and retest the crime scene materials.

59

defense.

At the hearing, the trial judge puzzled over how, even if the State were ordered to produce a hard copy, defendant would be "any better off than if you had what was on the ZIP-disk and you could go through it yourself and you could see every single thing." Id. at 72-73. She then ruled:

> Mr. Rumsey, I want to assure you that . . . I've given great thought to your request because I understand precisely why you want that. I also understand that the labs have provided the information you now seek in other cases. However, that was done voluntarily. . . . The State is not agreeing to provide this and so it becomes the duty of the Court to determine what the statute requires the State to produce.
>
> Having again considered the statute and the arguments of counsel, the Court again finds that the State has met its burden. Issues were raised this morning as far as how to cross examine Ms. Netzel, and I would propose that you showed in your questioning of your own doctor this morning very skillful ways to cross examine the State's expert as far as why . . . did they run so many tests, why did they change equipment, all of that is subject to cross-examination. The procedures that she used. In addition, there is still a sample that can be tested so an independent test can be done and there has also been evidence that (the ZIP-disk) can be used on another person's equipment and that the defendant's expert can obtain the information he wants by reviewing that information.
>
> Additionally, I suppose the defendant could (hire) a different expert who did have that equipment. The Court has not indicated who the defense must use for an expert but has simply allowed the use of an independent expert, so there are a variety of ways to remedy the situation.

Id. at 91-92. The judge cited Kansas law as holding that:

> when there was no substance left for the defendant to be able to do an independent test or for the

> expert of the defendant to analyze it, (and) in
> the absence of fraud or bad faith on the part of
> the state and its investigative agents, due
> process does not require the State to invite the
> accused to participate in or supervise testing
> procedures performed.

Id. at 92. Finally, the judge again noted a lack of material for independent analysis was "certainly not the case here." Id. at 93.

As indicated earlier, petitioner's convictions were affirmed by the Kansas appellate courts without discussion of any particular issue.

The 1507 judge hearing the myriad claims in Mr. McIntyre's state post-conviction proceedings, including that trial counsel was ineffective for failing to adequately attack the State's DNA evidence, reasoned that the jury was certainly entitled to weigh the plausibility of defendant's theory of defense by considering the DNA evidence left at the scene as circumstantial evidence of who committed the crimes, and that it was for the jury to determine the weight and credibility to be given this scientific evidence. The 1507 judge found:

> The primary defense relied upon by the defendant
> in the case is that he was not present at the
> scene of the crime and the eye witness
> identification was erroneous and did not
> correspond with his physical characteristics. The
> eye witness identified the person who committed
> the crimes as being much taller and heavier than
> Mr. McIntyre. The State had DNA evidence from the
> (KCM Lab) that identified the semen in the vaginal
> swab of the victim as being from Mr. McIntyre.
> Trial counsel filed several motions and retained
> an expert witness in an attempt to challenge the
> DNA test results.
>
> The defendant adamantly denied that he was at the
> scene of the crime and unbeknownst to the State

had a DNA test performed by a different
laboratory. The results of the second test
matched the results from the Kansas City Crime
Lab. Both results clearly establish that Mr.
McIntyre was the person at the scene and his semen
was found on the victim. . . .

Id. at 404. As previously indicated, retained counsel did not

present the claim that trial counsel was ineffective on the

specific ground that he failed to adequately challenge the State's

DNA evidence, to the KCA and the Kansas Supreme Court on collateral

appeal.

The first step in applying § 2254(d)(1) AEDPA standards is

to assess whether there was clearly established federal law as set

forth in the holdings of the Supreme Court. House, 527 F.3d at

1016-17; see Williams, 529 U.S. at 390. In the habeas context,

this clearly established federal law refers not to the case law of

the lower federal court but "to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the

relevant state-court decision." Id. at 412. Furthermore, this

clearly established federal law consists of Supreme Court holdings

in cases where the facts are at least closely-related or similar to

the case sub judice. House, 527 F.3d at 1016. If there is no such

clearly established law, that is the end of the court's inquiry

pursuant to § 2254(d)(1). See id. at 1018 ("The absence of clearly

established federal law is dispositive under § 2254(d)(1).")(citing

Carey v. Musladin, 549 U.S. 70 (2006)).

This court has neither been referred to nor found any

Supreme Court opinion holding that the State violates a defendant's

constitutional right to effective cross-examination or constitutional due process by refusing to provide in hard copy form all data underlying DNA test results, particularly where, as here, the facts include that the entire data was provided on a zip drive and sufficient material was available for the defendant to re-test. That concludes this court's inquiry.

Even if this court were authorized to review this claim under more general legal holdings of the Supreme Court, petitioner has not demonstrated that the unavailability of the hard copy rendered his trial fundamentally unfair.[42] See <u>Estelle v. McGuire</u>, 502 U.S. 62, 70 (1991)(evidentiary rulings must result in a fundamentally unfair trial before they rise to the level of a due process violation.); <u>see also Fox v. Ward</u>, 200 F.3d 1286, 1296 (10th Cir.), <u>cert. denied</u>, 531 U.S. 938 (2000). The record shows that the defense was given access to all the underlying data from the Lab's DNA analysis and more, just not in hard copy format. Petitioner makes no showing whatsoever that a hard copy of the information would have contained any exculpatory evidence that was

---

[42] The Supreme Court has held that, even though a defendant must be allowed to present a defense by examining and cross-examining witnesses, the Sixth Amendment right to cross-examine an adverse witness "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.". See <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973); <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 53 (1987)(plurality opinion); <u>see also U.S. v. Price</u>, 75 F.3d 1440, 1445 (10th Cir.) <u>cert. denied</u>, 517 U.S. 1239 (1996). The Supreme Court has also recognized that certain circumstances may give rise to a claim that the State violated a criminal defendant's right to due process by failing to provide evidence to the defense. See <u>e.g. Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)("suppression by the prosecution of evidence favorable to the accused upon request violated due process where the evidence is material either to guilt or punishment."). However, "there is no clearly established constitutional right to non-exculpatory discovery." <u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1103 (10th Cir. 2008)(citing <u>Gray v. Netherland</u>, 518 U.S. 152, 167-68 (1996)).

not available on the zip drive. See California v. Trombetta, 467 U.S. 479, 489 (1984)(To meet the standard of constitutional materiality, evidence must both possess an apparent exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by any other available measure.); U.S. v. Bagley, 473 U.S. 667, 682 (1985)(Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.).

In his federal petition and elsewhere, Mr. McIntyre has made conclusory suggestions of contamination and chain of custody problems. These challenges to the State's DNA evidence were not properly exhausted and have been defaulted as a result. Moreover, petitioner has never presented or even described any actual evidence that the scientists who conducted the analysis in this case either erroneously or intentionally embellished or faked the test results or that errors were committed in the handling, interpretation, or presentation of the DNA evidence, which rendered it unreliable. Petitioner has made no attempt to argue that the equipment and program used or the scientific analysis done in this case had not been accepted in the scientific community at the time of trial, or to otherwise suggest that the State's DNA evidence was admitted without proper foundation. In any event, the record demonstrates that the trial court was thoroughly briefed on and properly evaluated the issue of its admissibility.

Before this court and in his pro se 1507 petition, McIntyre

has attempted to expand this claim far beyond what was raised at trial and on direct appeal by adding allegations that the State's DNA evidence was improperly admitted through the testimony of Netzel rather than Olsson, who allegedly performed the actual testing, and that his confrontation rights were violated as a result. Cf. Crawford v. Washington, 541 U.S. 36, 68 (2004)(testimonial statements of a witness who does not appear at trial may not be admitted into evidence unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness); Melendez-Diaz v. Massachusetts, 557 U.S.___, 129 S.Ct. 2527 (June 25, 2009)(The admission of certificates of analysis violated the Confrontation Clause when the analyst did not testify at trial subject to cross-examination); cf. State v. Appleby, 289 Kan. 1017, 221 P.3d 515, 1058-59 (Kan. 2009). Even if petitioner had successfully addressed retroactivity and applicability questions, the fact remains that he did not present any such argument to the Kansas Supreme Court. It follows that this significantly different claim was not exhausted in state court, and has been procedurally defaulted.

## B. Ineffective Assistance of Counsel Claims

As noted, petitioner asserted 33 grounds for claiming ineffective assistance of counsel in his 1507 petition, and raised 12 of those in his federal petition. The grounds alleged in his federal petition, grouped and summarized, include trial counsel's failure to: (1) suppress the evidence seized from McIntyre's

residence and TW's "in-court pre-trial" identification; (2) interview Agent Smith, challenge Pryor's affidavit, redact an "NCIC document," and object to the State's comments about Carter's testimony; (3) obtain security videos from a K-Mart in Lawrence and a Quik Trip in Lenexa; and (4) challenge the DNA evidence on the basis that Netzel testified instead of Olsson, and with testimony from Dr. Stetler. Finally, petitioner claims (5) that counsel threatened and pressured him to relinquish his right to testify.

The court has found that Mr. McIntyre failed to fully exhaust his claims that trial counsel was ineffective based upon the numerous grounds alleged in his 1507 petition because he did not present this legal claim together with those factual grounds to the Kansas Supreme Court on collateral appeal. The court has also found that all those grounds are procedurally defaulted. The court recognizes that while retained counsel certainly did not argue petitioner's 33 claims to the appellate courts, he did include a couple of petitioner's allegations from the 1507 petition, albeit in support of his divergent legal claims. Counsel Fay's allegations to the KCA on collateral appeal, set forth earlier in more detail, included that McIntyre could not prove his defense of mistaken identity because Rumsey forced him not to testify. The KCA did not delineate what issues were briefed by counsel and hold that only those were properly before it. Instead, they merely stated that they had reviewed the record and the 1507 judge's "comprehensive memorandum decision," which they concluded should be affirmed. Thus, one might conceivably deduce that the KCA

considered all the claims determined by the 1507 judge. Counsel Fay's claims and arguments to the Kansas Supreme Court on collateral appeal also set forth earlier, did not include a single ground for ineffective assistance of counsel that had been raised in McIntyre's 1507 petition. However, since the Kansas Supreme Court summarily affirmed the KCA, one might further deduce that the highest state court also considered all the 1507 claims. This court has taken the view that claims not presented by retained counsel in the Petition for Review to the Kansas Supreme Court were not considered by that court. However, the court perceives that whether or not any of petitioner's grounds for this claim were exhausted might be viewed differently by another court. For this reason, this court remarks that even if some or all of petitioner's ineffective assistance of counsel grounds could be viewed as adequately exhausted by retained counsel's arguments on collateral appeal, which included that the 1507 judge improperly refused to consider petitioner's claims of multiple errors of trial counsel, this court would find that the state courts' denial of this claim was a reasonable application of the correct Supreme Court standard.

The state courts unquestionably applied the correct legal standard in considering those of petitioner's claims regarding counsel that were presented to them. The 1507 judge expressly applied the "two-prong standard set forth in <u>Strickland v. Washington</u>," 466 U.S. 668 (1984), which he noted had been adopted by the Kansas Supreme Court in <u>Chamberlain v. State</u>, 236 Kan. 650, 656-57 (Kan. 1985). <u>Id.</u> at 402-03. The KCA noted that the

district court properly relied on the two-prong Strickland test, and affirmed the 1507 judge's holdings. The Kansas Supreme Court's summary denial was an affirmation of the standards applied by the lower courts.

Under Strickland, a defendant claiming ineffective assistance of counsel must establish two things. First, he must establish that counsel's performance was deficient. Second, the defendant must establish that counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. To show deficient performance, a defendant must demonstrate that counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the United States Constitution. In addition, the defendant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id. at 688-89. Judicial scrutiny of counsel's performance must be highly deferential. There is a strong presumption that counsel's conduct comes within the wide range of reasonable professional assistance.

To show prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient conduct, the result of the proceeding would have been different. Id. at 696. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 698. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. Id. at 697.

The Supreme Court recently emphasized that the role of the federal habeas court in reviewing a state prisoner's ineffective assistance of counsel claims differs from that of the state court on direct or collateral appeal. <u>Harrington</u>, 131 S.Ct. at 770. The Supreme Court instructed that for the federal district court "[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable," and that "[t]his is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Id.</u> at 785. The Court reasoned that, "[w]ere that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court." <u>Id.</u> They further reasoned that under AEDPA, "it is a necessary premise that the two questions are different," (citing <u>Williams</u>, 529 U.S. at 410), since a "state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself." <u>Id</u>. The Court also instructed that "[i]f this standard is difficult to meet, that is because it was meant to be," and that "[a]s amended by AEDPA, §2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." <u>Id.</u> at 786 (citation omitted). The Court reasoned that § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted). Consequently, "[a]s a condition

for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable'." Id. at 787-88 (citing Strickland, 466 U.S. at 687.) Under §2254(d) then, "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788. In answering this question, "a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

Most of counsel's failures charged in the federal petition do not evince "extreme malfunctions in the state criminal justice system" and are not shown to have been "so serious as to deprive the defendant of a fair trial." Thus, assuming these grounds were considered by the Kansas appellate courts, the rulings of the state courts affirming their denial are not shown to have been an unreasonable application of Strickland. Some of these claims have been discussed and discounted elsewhere herein, and many are not supported by sufficient facts showing counsel's performance was

deficient or that prejudice resulted.

This court is more concerned with petitioner's claims that counsel threatened and coerced him into relinquishing his right to testify, and failed to competently present his defenses at trial including adequate challenges to the State's DNA evidence. The court reiterates that the arguments presented by retained counsel in the Petition for Review on collateral appeal did not specify these particular grounds. Counsel alleged only that the 1507 judge failed to consider all grounds previously raised for this claim. Even assuming this could be viewed as adequate exhaustion, this court would affirmatively answer the question of "whether there is any reasonable argument" that counsel in this case satisfied Strickland's deferential standard.

The 1507 judge held an extensive evidentiary hearing on petitioner's claims of ineffective assistance of counsel, at which counsel testified. The judge specifically found that McIntyre was "fully informed" by counsel and "was not coerced into not testifying." This decision was affirmed by the KCA, and review was denied by the Kansas Supreme Court. Petitioner has not shown that these state court rulings were the result of an unreasonable application of <u>Strickland</u>. See <u>Harrington</u>, 131 S.Ct. At 783-84 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

It is primarily defense counsel's responsibility to advise

the defendant on whether or not to testify and to explain the tactical advantages and disadvantages of doing so.  See U.S. v. Goodwin, 770 F.2d 631, 637 (7th Cir. 1985), cert. denied, 474 U.S. 1084 (1986).  The record shows that Rumsey clearly consulted with and advised his client of his rights and about the problems with his defense.  The record also shows that counsel explicitly informed McIntyre that the decision whether or not to testify was his alone to make.  Mr. McIntyre obviously took counsel's advice into consideration in making his decision, but does not present persuasive facts indicating that his "will was overborne."  Id.

Petitioner's claims that his defenses were not adequately presented are intertwined with his claim that he was prevented from testifying.  He criticizes his attorney for not developing and concentrating upon an alibi defense supported mainly by his own testimony,[43] and his theory that he had produced a voluntary semen sample at the CCA, which was used to manufacture the State's DNA evidence.  Counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  Harrington, 131 S.Ct. at 789 (citations omitted).  Strickland further permits

---

[43]     Mr. McIntyre's own account, assuming he would have testified as he now alleges, is not so clearly exculpatory that Rumsey's advice strongly discouraging this testimony was constitutionally unreasonable.  Petitioner now alleges that on July 2, 1999, Carter was waiting for him after work and asked to use the Honda to go to Oak Park Mall.  He alleges that Carter was accompanied by three men, two of whom were wearing red t-shirts.  He gave Carter the car keys at approximately 7:30 p.m., but told him to come right back.  He further alleges that around 8:45 p.m., he walked to Quik Trip and called a mutual friend, Mr. Settle, who reported that Cyrus had called and said the Honda was stolen at the mall.  McIntyre then went to Scooners Bar and Grill at 95th and Lackman Rd, and called the Lenexa police at 9:45 p.m. to report the Honda stolen.

counsel to "make a reasonable decision that makes particular investigations unnecessary." Id. at 788 (citing Strickland, 466 U.S. at 691). Here, defense counsel had reasons to seriously doubt the veracity of his client's alibi and evidence-tampering theory, particularly in light of McIntyre's varying accounts, the State's DNA evidence, and the highly inculpatory independent DNA test results.[44] Moreover, counsel surely perceived that promoting these defenses carried grave risks. Attempting to present evidence of tampering could have increased the likelihood that the State would be allowed to discover and present evidence that independent testing had confirmed the State's DNA test results, and that, in turn, could have exposed McIntyre's alibi and tampering claims as fabrications. Fabricating an account to divert suspicion is indicative of guilt and therefore incriminating. In addition, "the Sixth Amendment does not require that [trial] counsel do what is impossible or unethical." U.S. v. Cronic, 466 U.S. 648, 657 n. 19 (1984); see also Nix v. Whiteside, 475 U.S. 157, 175 (1986)(no Sixth Amendment violation of right to effective assistance of counsel when trial counsel refuses to violate ethical duty not to

_____

44      With modern DNA testing, "[i]t is now often possible to determine whether a biological tissue matches a suspect with near certainty." District Attorney's Office v. Osborne, ___U.S.___, 129 S.Ct. 2308, 2316 (2009). "Indeed, short tandem repeat (STR) 'DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime.'" Id. at 2327 (Alito concurring)(citing Harvey v. Horan, 285 F.3d 298, 305 (4th Cir. 2002). "Recent scientific advances in DNA analysis have made 'it literally possible to confirm guilt or innocence beyond any question whatsoever, at least in some categories of cases.'" Id. at 2335 (Stevens dissenting)(citing Harvey, 285 F.3d, at 305). On the other hand, DNA analyses are "plagued by issues of suboptimal samples, equipment malfunctions and human error," including unintentional and intentional mishandling or tampering. Id. (citing Harvey, 278 F.3d at 383, n.4).

assist his client in presenting perjured testimony).

Strategic and tactical decisions are the exclusive province of counsel, after consultation with the client. Counsel expressly considered McIntyre's own proposed testimony and what effect it would have on the jury, in light of the totality of the evidence presented at trial. See Strickland, 466 U.S. at 696)("In making a prejudice determination, the strength or weakness of the State's case is relevant."). The State had overwhelming evidence of Mr. McIntyre's guilt including scientific evidence that his DNA matched semen in the victim's vaginal cavity and semen stains located on her underwear.[45] Evaluating the conduct of petitioner's trial counsel from counsel's perspective at the time, the 1507 judge reasonably found that Mr. Rumsey made a professional and tactical decision to advise Mr. McIntyre not to directly testify that he was not at the scene or that he had an alibi. The state court could have reasonably determined that counsel's advice was the result of professional judgment and sound trial strategy, and that counsel's performance was not constitutionally deficient in deciding instead to defend Mr. McIntyre based upon the State's failure to adequately identify him as the perpetrator and thus prove its case. "When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." Harrington, 131 S.Ct. at 791. Thus, the record reveals imminently reasonable arguments that the state

---

[45] Defense counsel expressed frustration at the 1507 hearing that he had been unable to convince Mr. McIntyre to consider a plea agreement.

courts could have relied upon in finding that trial counsel's advice satisfied Strickland's deferential standard.

The record further demonstrates that trial counsel's overall performance amounted to very "active and capable advocacy." Even though defense counsel was aware before trial that the State had DNA evidence which identified Mr. McIntyre as the rapist and thus placed him at the scene, guilt was by no means conceded. Counsel thoroughly investigated and tested the State's DNA evidence, at length and with extensive knowledge of the subject. As noted elsewhere throughout this Order, counsel filed and litigated extensive pre-trial requests for discovery, and a multitude of other motions. The record shows careful preparation of these motions and the inclusion of scholarly supporting memoranda and exhibits. Counsel consulted at length with experts and sought permission to hire an additional expert on eyewitness identification, which was denied. The trial transcript also demonstrates an active oral defense, including examination and cross-examination of witnesses. Counsel ably argued for favorable instructions regarding eyewitness testimony.[46] Trial counsel

---

[46] The court instructed the jury that the burden was on the State to identify the defendant, and the law did not require the defendant to prove he has been wrongly identified. TT 777. The jury was also instructed that in weighing the reliability of eyewitness identification testimony, it should first determine whether certain specified factors existed and, if so, the extent to which they would affect accuracy or identification of an eyewitness. The factors included, but were not limited to, the opportunity the witness had to observe and the length of time of observation, the emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence, whether the witness had observed the defendant on earlier occasions; whether a significant amount of time elapsed between the crime charged and any later identification, whether the witness ever failed to identify the defendant or made any inconsistent identification, and the degree of certainty demonstrated by the witness at the time of any identification of the accused. Id. at 777-778.

undoubtedly met the Supreme Court standard that "[e]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." Cronic, 466 U.S. at 657 n. 19.

The 1507 judge's opinion that the independent DNA test results "mooted" petitioner's challenges involving the State's identification and DNA evidence was essentially a finding that, even if Mr. McIntyre could show deficient performance as to this evidence, he could not show prejudice. If indeed the Kansas Supreme Court affirmed this ruling of the 1507 court, petitioner has not shown that it was an unreasonable application of Strickland. The most effective way for the defense to test the State's DNA evidence was to retest the DNA samples. Sufficient material remained and was made available to Mr. McIntyre for retesting. This avenue of defense was fully and properly pursued by counsel given his client's position. The results confirming the State's scientific evidence were not produced at trial for obvious reasons. Nevertheless, the state courts reasonably determined that the independent results, introduced through petitioner's direct questioning and waiver at the 1507 hearing, established that Mr. McIntyre could not prejudice under Strickland.

C.  ***1507 Proceedings***

Petitioner makes additional allegations which appear to be challenges to the Douglas County District Court's four-day long evidentiary hearing on his state post-conviction motion and the

rulings of the judge.  He claims that, unlike the State, he was denied the opportunity to call "all his witnesses."  He also claims that the district court failed to make "findings of fact and conclusions of law" on "each issue raised" in his 1507 petition and the evidence presented, as required by Supreme Court Rule 183(j) and cited Kansas cases.  He complains that the district court incorrectly found that thirty-five of his thirty-six claims had been raised before in his pro se supplemental brief on direct appeal and used this as its reason for not addressing them.

As previously noted herein, there is no federal constitutional requirement that states provide a post-conviction review process.  See Pennsylvania v. Finley, 481 U.S. at 557.  It logically follows that grounds for relief that focus only on the process afforded in a Kansas post-conviction proceeding and not on the conviction which led to the petitioner's incarceration fail to state a claim cognizable in a federal habeas proceeding.  Sellers v. Ward, 135 F.3d 1333, 1339 (10th Cir. 1998), cert. denied, 502 U.S. 912 (1991).  Furthermore, petitioner's claims that the 1507 judge failed to make findings of fact and conclusions of law are based upon state law, the violation of which does not amount to grounds for federal habeas corpus relief.

The court concludes that petitioner is not entitled to federal habeas corpus relief under 28 U.S.C. § 2254.

**IT IS THEREFORE ORDERED** that this action is dismissed and all relief is denied.

**IT IS SO ORDERED.**

Dated this 18th day of February, 2011, at Topeka, Kansas.




                                        s/Sam A. Crow
                                        U. S. Senior District Judge